HARRY C. HASKINS

*v.*

· THOMAS F. RYAN.

[Decided August 10th, 1906.]

1. Complainant studied the situation with regard to the white lead industries outside a certain company, and conceived and formulated a plan for combining them in one company, to do which would require several millions of dollars; procured options on such industries, or opened negotiations for their purchase, and laid the plan before defendant, a capitalist, seeking his co-operation and aid, himself agreeing to contribute, if necessary, as much as $200,000, if defendant would join him therein, and also contribute enough to carry the enterprise through. Defendant expressed a willingness 'to join him therein, provided an examination of the plan and papers by defendant's attorneys, and experts confirmed the statements made by complainant to defendant, and such examination confirmed such statements. Defendant, however, availed himself of the information furnished by complainant, and, independently of him, organized a company, and got control of the industries, and made large profits therein.—*Held,* that there being but an agreement to enter into a definite agreement, equity could give no relief, but the remedy, if any, was by action at law for wrongful appropriation of the plan.

2. A mere idea, unprotected by contract or statute, is not capable of legal ownership.

On demurrer to bill.

*Mr. Robert H. McCarter,* for the complainant.

*Mr. Richard V. Lindabury* and *Mr. William H. Page, Jr.,* for the defendant.

STEVENS, V. C.

To the bill in this case a general demurrer is pleaded. The bill alleges, in substance, that during the years 1898 and 1899, 1900 and 1901, the complainant devoted a large part of his time to the study of industrial conditions connected with the output of pig lead in the United States, and had conceived the plan of

uniting the outstanding lead interests, which had not already become a part of the National Lead Company, into one company, and had either procured options thereon or had opened negotiations for their purchase; that in the spring of 1891

"he had crystallized and formulated a complete plan for the combination of the white lead industries in the United States not already in the National Lead Company; that he laid such plan before the defendant, a capitalist; that he sought his co-operation and aid, and himself agreed to contribute, if necessary, as much as $200,000, if the defendant would join him therein, and also contribute enough to carry the enterprise through."

The bill alleges further that defendant, to quote from the bill,

"expressed a willingness to join your orator therein, provided an examination of the plan and papers by the attorneys, and experts of said Ryan [the defendant] confirmed the statements of your orator made to him."

The bill then alleges that the complainant submitted the plan to Ryan's attorney, and was subsequently told by him that he had submitted it to Ryan, and had endorsed it "as comprehensive, feasible and attractive;" that through the efforts of Ryan's agents, options had been obtained upon most, if not all, of the properties upon which the complainant had options, and that on January 20th, 1903, the United Lead Company was organized as a corporation under the laws of New Jersey, and, under the direction and control of Ryan, proceeded to acquire, and now owns, the interests in nearly all the companies, firms and individuals named in complainant's plan, and is capitalized with a capital stock of $15,000,000, and has issued bonds for $17,000,000; that in the formation and exploitation of this company, the defendant, Ryan, "has made an enormous profit, the amount of which is unknown to complainant," and that a combination substantially as planned by complainant has taken place, or is about to take place, with the result of great profits to said Ryan.

The bill then charges that Ryan's act of availing himself of the information complainant had collected and had only disclosed to Ryan

"upon the agreement and understanding on the part of the said Ryan that he would join your orator in the, said scheme and share with him in the profits arising therefrom is contrary to equity,"

but I do not understand that by this general charge it is intended to allege any other understanding or agreement than that contained in the stating part of the bill, viz., that Ryan had expressed a willingness to join complainant in his project, provided an examination of it by Ryan's attorneys and experts should confirm complainant's statements.    The bill asks for a discovery and account of Ryan's profits and a decree that complainant is entitled to a share of them.    Ryan is the sole defendant.

It is perfectly plain that no recovery can be had in this case on the basis of a completed agreement broken by Ryan.    The plan, a copy of which is appended to the bill, contemplates the raising of $15,000,000 for the purpose of acquiring the properties of the various concerns, twenty-two in number, other than that of the National Lead Company.    The raising of a fund with which to purchase these properties was of the essence of the plan, but complainant had not bound himself to contribute any *definite* sum, and Ryan had not bound himself to contribute anything.    Even if, without direct averment, we should infer that an examination of the plan and papers had been made by Ryan's experts, and that such examination confirmed complainant's statements to Ryan, nothing more is shown than that Ryan agreed to join in the plan—that is, agreed to enter into a definite and explicit agreement on the subject.    But nothing is better settled than that equity will not compel the specific performance of an agreement to make an agreement.    *Lane* v. *Calvary Church, 59 N. J. Eq. (14 Dick.) 413;* affirmed on appeal.

An account on the basis of a completed agreement is therefore quite out of the question.

As I understand the complainant's argument, he does not rest his case on any such basis.    His contention is this:    The plan is my property.    The defendant has appropriated it to his own use.    I claim an account of the profits arising from its appropriation.

37

If in point of fact the plan has been wrongfully taken or appropriated, the remedy, if any, would appear to be an action on the case for damages, the amount of damages being its fair value. But the plaintiff does not, and in this court could not, demand damages. He asks for a discovery and an account of profits.

The fact that he has not been able to cite any precedent for the claim he makes is not, of itself, conclusive if he can bring himself within the principle upon which an account is given.

The complainant has undoubtedly the right to claim protection in this court for his manuscript. It would seem that, without any reference to whether the plan is or is not open to the objection that it seeks to create a monopoly (*Kerr Inj. 186; Oliver* v. *Oliver, 11 C. B.* (*N. S.*) *139*), he would have the right to restrain its publication or to prevent its use; and in the case of an author the law does more than protect the manuscript regarded as a material thing of ink and paper. The combination of words of which it is composed (whether written down, or acted or sung before an audience admitted on payment of a fee) is also protected, and publication is restrained even if the manuscript be destroyed and an attempt be made to reproduce it from a copy rightfully in the possession of another, or even from memory. The work is protected indefinitely, before publication, by the common law (*Aronson* v. *Baker, 43 N. J. Eq.* (*16 Stew.*) *366; New Jersey State Dental Association* v. *Dentacura Company, 57 N. J. Eq.* (*12 Dick.*) *594; 58 N. J. Eq.* (*13 Dick.*) *582*), and for a limited time, after publication, by the statutory law of copyright. The law has never attempted to go beyond this and to enjoin, for the benefit of the author, after publication, the use of the ideas contained in his work.

In the case of secret processes of manufacturing, the law does, to a certain extent, enjoin the use of ideas. It would, of course, on the same principle on which it affords protection to the unpublished manuscript in the hands of the author, enjoin the publication or exhibition of the paper containing the formula; but it does more. In enjoining the use of the formula it restrains the wrong-doer from putting the idea formulated to practical account. *Stone* v. *Grasselli Company, 65 N. J. Eq.*

(*20 Dick.*) *756.* The protection ends when the secret becomes known. In the case of patent rights the statute goes still further. It affords protection for a limited period to a certain class of ideas, known as useful inventions, after the inventor has published them to the world, and because he has so published them. The valuable right here protected is not, as in the case of copyright, the manuscript or writing regarded as a peculiar combination of words or figures, but the idea or conception to which those words or figures give rise, so far as that idea or conception may admit of material embodiment. If the idea contained in the patented device of A suggests to the mind of B another idea, which would not have arisen in the mind of B but for the stimulus of the prior idea, A can claim no property in that, and yet B has mentally appropriated A's idea and made it the basis of his own, and I do not suppose that it has ever been contended that the entire public are not at liberty to subject A's idea to such investigation and discussion as it may desire. The wrong does not commence until the attempt is made to make or dispose of its material embodiment.

I now come to the precise question here involved. It is this: Has the complainant a property right in the scheme or idea to be found in his plan as contradistinguished from the property right which he has in his manuscript, regarded as a combination of words and figures, a thing of ink and paper?

A right is defined to be that interest which a person actually has in any subject of property, entitling him to hold or convey it at pleasure. But that can hardly be styled property over which there is not some sort of dominion. Now, as I have already said, the combination of words and figures contained in complainant's plan belongs to him absolutely. Its publication or reproduction or exhibition in any form may be enjoined. But the idea contained in the plan differs from the ideas to which I have already called attention in this important respect: It involves the voluntary action and co-operation of many different men. When I say voluntary action, I mean action not restrained by contract, for the allegation that complainant had "options" is altogether too vague to warrant an inference that they are still subsisting, or that complainant had the means of availing

himself of them without the aid of outside capital. Besides, the allegation is not that he has procured options on all the properties which it was proposed to combine, but that he either had options on them or had "opened negotiations for their purchase." The means of carrying out the plan; of giving effect to the idea lay, therefore, beyond his control. It was an idea depending for its realization upon the concurring minds of many individuals, each of them unbound by contract and free to act as he chose. Such a project or idea can scarcely be called property. It lacks that dominion—that capability of being applied by its originator to his own use—which is the essential characteristic of property. It differs fundamentally from the secret process or patented invention which is capable of material embodiment at the will of the inventor alone. It is worthless unless others agree to give it life. It was, as far as complainant was concerned, an idea pure and simple. Now, it has never, in the absence of contract or statute, been held, so far as I am aware, that mere ideas are capable of legal ownership and protection. Says Lord Brougham, in delivering his judgment in *Jeffreys* v. *Boosey, 4 H. L. Cas. 965:* "*Volat irrevocabile verbum,* whether borne on the wings of the wind or the press, and the supposed owner instantly loses all control over it. * * * He has produced the thought and given it utterance, and *eo instanti* it escapes his grasp."

Justice Yates, in his dissenting opinion in the great case of *Millar* v. *Taylor, 4 Burr. 2303, 2366* (an opinion which was afterwards concurred in by the house of lords), said: "Where are the *indicia* or distinguishing marks of ideas? What distinguishing marks can a man fix upon a set of intellectual ideas so as to call himself the proprietor of them? They have no earmarks upon them." A case much like the present is that of *Bristol* v. *Equitable Assurance Society of New York, 5 N. Y. Sup. 131; 132 N. Y. 264.* There the complainant confidentially disclosed to the president of a life insurance company a system of soliciting life insurance devised by him. It was alleged that the company, after the disclosure, used the plan without complainant's consent. On demurrer, it was held that the plaintiff could not recover for the alleged use.

I am therefore of opinion that complainant has no property right in his plan regarded as an idea. Having no property right, he has no right to an account.

But if a court of equity cannot treat complainant's idea as property, it is also incapable of giving him the remedy of account on another ground. The charge of the bill is that Ryan should account for complainant's share of any profits reaped by him from, or in connection with, the promotion and exploitation of the United Lead Company. Now, what profits could the defendant reap therefrom? The suggestion is that he might reap the profits of a promoter. A promoter may sometimes get shares not issued for money or property purchased. Such shares, viewed from a legal standpoint, are not of much value. But he may also get, by contract, fully-paid shares. It is presumably of such shares that the complainant desires an account. Now, on what basis could there be an equitable division of such shares? The complainant charges that it was part of his plan, personally, to contribute up to $200,000 if necessary. He has, in fact, contributed nothing. The plan contemplated the raising of $15,000,000. Ryan's interest in the company would depend in part upon the extent to which he had himself contributed, and in part upon other considerations having no relation to complainant. This being so, it would seem to be utterly impossible, on any recognized basis of apportionment, to take from Ryan a part of his shares and give them to complainant. Complainant no doubt expected to secure shares, partly in return for the money to be put in by him and for the services to be performed by him, and partly for the prior work done in formulating the scheme. How much his collaborators in the undertaking, had they taken him in, would have allowed him for what he had done or would do is altogether conjectural. It would naturally have been a matter of express contract. I am quite unable to see how a court of equity could make him an allowance by way of account of profits, based upon a condition of affairs wholly unanticipated and wholly unprovided for. Manifestly the only way of compensating him on any rational basis would be to ascertain what his plan was reasonably worth, and then to give him damages. This, of course, would presup-

pose a property right in the plan. Conceding such right, the damages, if recoverable at all, would be recoverable in a court of law in an action on the case, and not in equity.

I think the complainant's bill should be dismissed.