## LUEDDECKE v. CHEVROLET MOTOR CO. et al.

### No. 9811.

Circuit Court of Appeals, Eighth Circuit.

March 16, 1934.

James A. Finch, Jr., of Cape Girardeau, Mo. (James A. Finch, of Cape Girardeau, Mo., and Floyd E. Jacobs, M. J. Henderson, and Thomas E. Deacy, all of Kansas City, Mo., on the brief), for appellant.

David A. Murphy, of Kansas City, Mo. (John T. Harding and R. Carter Tucker, both of Kansas City, Mo., on the brief), for appellees.

Before GARDNER and WOODROUGH, Circuit Judges, and MARTINEAU, District Judge.

WOODROUGH, Circuit Judge.

Mr. H. W. Lueddecke brought this action at law, as plaintiff, against Chevrolet Motor Company and other corporations (all referred to herein as companies), as defendants, to recover on an alleged implied contract on the part of the defendant companies to pay plaintiff the reasonable value of an idea and suggestion which he alleges he furnished to them. Demurrers were interposed to the petition and were sustained Plaintiff having declined to plead further, the case was dismissed, and the plaintiff appeals.

The petition alleges that the plaintiff sent the following letter to the companies:

"Dear Sirs: As the proud owner of a Chevrolet Sedan, and also with the knowledge of a man who knows automobiles, I am asking you a few questions and then making you a proposition.

"Do you know that a very serious error has been made in the general location of several of the individual units or mechanisms of the Chevrolet car? Do you also know that within another year or so this very error (unless corrected) will reduce Chevrolet sales by possibly a million or even several million dollars? And again, while I, as well as many others, have had and will still have this error of your designers overcome at considerable expense, it will within a short space of time possibly cause some other low-priced car to become more popular than the Chevrolet.

"While many car owners have gone to the trouble of correcting this defect, I have found neither an owner nor a mechanic who was able to discover the cause of the defect. And. unless corrected, the defect will mean considerable annual expense to the owner of the car, for which there is really no excuse at all.

"The cost of overcoming this defect in a car should not be over 20¢ to 30¢ to you as you build the car if you take the easiest and shortest way out of the difficulty. To the owner who has purchased his car the cost will vary from $3.00 to $7.00 depending on where he lives, in city or country.

"The best way out of the difficulty, however, would necessitate a change of design as suggested above, and that can be done without great expense or without sacrificing the essential features of the design of the car.

"Now, I shall not ask you for a one-eighth royalty on $500,000 or $1,000,000 of sales, but I would like to have you make me an offer stating what such information would be worth to you—or how much you could offer and would pay for the same. Upon receipt

of your reply, if your offer is satisfactory, I will give you complete information of the above mentioned changes for the Chevrolet car.

"An early reply will be appreciated.
"Yours truly,"

That reply was made as follows:

"Dear Sir: Your letter of June 27, to the Chevrolet Motor Company, regarding your suggestion to change the design of Chevrolet cars, has been forwarded to the New Devices Committee for attention.

"We have this Committee in General Motors, composed of some of our most important executives and engineers, to review all new inventions submitted direct to the Corporation or through any of its divisions or executives.

"It is against the policy of the Corporation to make any agreement for inventions until we know exactly what they are and have sufficient information to place them before the New Devices Committee for consideration.

"If you care to send us drawings and a description of your ideas, the Committee will be very glad to examine them and let you know whether or not General Motors is interested.

"We always insist, however, that everything submitted to us be protected in some way and would suggest, if you have not applied for patents, that you establish legal evidence of ownership and priority of your idea by having your original drawing signed, dated and witnessed by two or more competent persons or notarized.

"We assure you that, if we find the design of sufficient interest to warrant further investigation, some mutually satisfactory agreement will be made.

"Yours very truly,
"New Devices Committee."

That plaintiff then answered:

"Dear Sirs: I have Mr. T. O. Richards' reply (dated July 15th) to my letter of June 27th. Referring to my previous letter you will find that I said that your designers of the Chevrolet car had made a very serious blunder in the location of several of the individual units of the car. I also stated that many car owners have gone to the trouble of correcting the defect, either temporarily or permanently, at considerable expense to themselves. But I have never found either a mechanic or a car owner who knew the cause of the trouble drivers were having with their cars. Because of this fact I thought it expedient and profitable to take the matter up directly with your company.

"Now the matter that I have to present is this: You will find that the body of *all* Chevrolet cars that have been driven 200 miles or more is from one inch to three inches lower on the left side of the driver than on his right side. Because of this the left rear fender especially, in driving over fairly rough or wavy streets or in rounding corners to the right, will quite often strike against the tires. This has been the cause of tearing up tires or of suddenly slowing down the car—thereby making accidents likely. The experience is also annoying to the driver and occupants of the car.

"Many drivers seem to think that the springs on the left side were naturally weak and not so good; others seem to think that they struck a bad place in the road and that the springs lost their elasticity as a result. But the fact of the case is that the car is not properly balanced—right side against left side. On the left side you have the steering mechanism, the starter, the generator, and the storage battery. This, together with a one hundred fifty pound (150#) driver, when one drives by himself, throws approximately three hundred pounds (300#) more weight on the left side than on the right side of the car.

"After I had driven my car about 2,800 miles the body was exactly two and three-quarters inches lower on the left side than on the right side. In order to level the body of the car I had an extra spring leaf put into both the front and rear springs on the left side, and that straightened the body up perfectly. My plan is that you either put in this extra spring leaf in both front and rear springs on the left side of the car when you build the car, or else you should change the location of some of the individual units—shifting those units which could be most conveniently moved to the right side of the car or motor. It is my idea that the battery should be moved from the left side to the right side. This would take about fifty pounds from the heavy side and add it to the light side. Then either or both the starter and generator should be moved to the right side of the motor—they would just about balance the weight of the steering unit and the usual excess weight of the driver over his front seat mate.

"The facts given above cannot be denied, and the remedy is simple and clear. I hope you will find them of profit to your firm. I

would appreciate a reply at your earliest convenience.

"Respectfully submitted."

To which the New Devices Committee replied:

"Dear Sir: This will acknowledge your letter of July 22 regarding a system for balancing the weight of cars.

"The Committee, at its last meeting, thoroly discussed your suggestion but decided, unfortunately, that it would not be advisable to redesign our springs in this manner at the present time. We cannot therefore, see our way clear to go into the matter with you further.

"We appreciate your interest in General Motors and regret that we cannot reply to you more favorably.

"Yours very truly,
"New Devices Committee."

It is then alleged in the petition that the plaintiff, by and through these letters, did sell and convey to the defendants ideas as to how to balance a Chevrolet car so that the fenders would not strike the wheels, and more particularly to balance the car so that the weight would be more evenly divided on both sides, and that he forwarded his ideas in the form that defendants had requested, and that thereafter the defendants had put into force and effect the ideas so submitted by the plaintiff, or a portion thereof, and that the defendants had, since the plaintiff's ideas were presented to them, used the same or substantial portions thereof on all Chevrolet motorcars manufactured by the defendants, and by the defendants' request that the plaintiff forward his ideas to them, and by using the same, or portions thereof, there was an implied contract on the part of the defendants to pay to the plaintiff the reasonable value of said ideas, which said reasonable value it is alleged was $2,500,000.

We are of the opinion that the demurrers were properly sustained by the trial court. In the first place we are not persuaded that the idea communicated in the letters of the plaintiff was a novel and useful idea in which plaintiff could successfully assert a property right. In the second place, the correspondence and alleged conduct of the companies controvert the claim that there was a promise to pay plaintiff for the ideas or suggestions which he transmitted, and there are no circumstances presented from which the law implies such a promise.

It appears from plaintiff's first letter to the companies that it was then known to many others besides the plaintiff that there was a defect in the Chevrolet car as it was being manufactured and sold. Plaintiff did not claim to be the discoverer of this defect in the car. He says: "I, as well as many others, have had and will still have this error of your designers overcome at considerable expense." "Many car owners have gone to the trouble of correcting this defect." The plaintiff's second letter discloses that the defect he had in mind was that the body of the car was not held suspended in balance by the springs with sufficient strength to maintain a constant equilibrium, but that when the car was used the body would sag down on the left side. The remedy availed of by himself and others was to reinforce the springs on the side where the body sagged. This much of the idea being generally known and common property, the only other idea which the plaintiff conveyed to the defendants is in the suggestion that the defendants relocate some of the individual units contained in the body of the car with reference to the center of gravity of the car, "Shift those units which could be most conveniently moved to the right side of the car or motor." Plaintiff says: "It is my idea that the battery should be moved from the left side to the right side. This would take about fifty pounds from the heavy side and add it to the light side. Then either or both the starter and generator should be moved to the right side of the motor—they would just about balance the weight of the steering unit and the usual excess weight of the driver over his front seat mate."

From these statements it is apparent that the plaintiff did not claim to know just what shifting of individual units from one side of the car to the other would be necessary or practicable to effect the proper balance of the car in use. He recognizes cases when "one is driving by himself and thereby puts the weight of his body on one side of the car." He reflects the thought that there is a "usual excess weight of the driver over his front seat mate." In other words, that, when several passengers are riding in a car, the weight may not bear evenly on both sides of the center of gravity of the body of the vehicle. Plaintiff's suggestion really was that the companies should make experiments in redisposing some of the readily movable units mounted on the car body and in shifting them from the left to the right side of the car until a balance was effected which would turn out to be enduring in use. The plaintiff said, in effect: It is known that your car body sags

lopsidedly to the left when it is being used. I suggest that you try shifting the units which can be most conveniently moved until you get a better balance.

Plaintiff did not say that he had made any such experiments himself or that he knew through experiments what the effect of the suggested shifting of units would be upon a car when the car was used. Plaintiff alleges that what the companies did after they got this letter was to shift the battery from the left side to the right side of the car and also other equipment as set out in the letter "or a portion thereof." That is, the defendants, knowing as others knew that the body of their car when the car was used sagged lopsidedly to the left, transposed fifty pounds of batteries to the opposite side and such other movable equipment as they found from experiment (or engineering calculations) sufficed to produce a more effective balance of the car body when the car was in use. The matter would be no clearer or simpler if we had to do with spring wagons or buggies rather than Chevrolet automobiles. The springs of either vehicle have to be strong enough to offset some uneven disposal of weights on the body. The mere idea of experimenting with the disposal of the weights was not novel and useful, and plaintiff had no property right therein. Soule v. Bon Ami Co., 201 App. Div. 794, 195 N. Y. S. 574.

In Masline v. New York, etc., R. Co., 95 Conn. 702, 112 A. 639, 641, the court stated: "An idea may undoubtedly be protected by contract. Haskins v. Ryan, 75 N. J. Eq. 332, 78 A. 566. But it must be the plaintiff's idea. Upon communication to the defendant it at once did appear that the idea was not original with the plaintiff, but was a matter of common knowledge, well known to the world at large. He had thought of nothing new, and had therefore no property right to protect which would make his idea a basis of consideration for anything. His valuable information was a mere idea, worthless so far as suggesting anything new was concerned, known to every one, to the use of which the defendant had an equal right with himself."

In the second place, the letter of the New Devices Committee of the companies to the plaintiff contains no promise to pay for any mere suggestion or idea which the plaintiff might choose to send them. They said it was against the policy of the companies to make any agreement for inventions until they knew exactly what they were. They suggested that plaintiff establish legal evidence of his ownership of his ideas by having his original drawing notarized. In the first letter plaintiff said: "I, as well as many others, have had and will still have this error of your designers overcome at considerable expense." "The best way out of the difficulty would necessitate a change of design." And, therefore, the committee suggested that plaintiff send drawings and a description of his ideas, and that he establish legal evidence of ownership and priority of his ideas by having his original drawing signed or notarized, and that, if they found the design of sufficient interest to warrant further investigation, some mutually satisfactory agreement would be made.

The clear implication is that the companies did not make any agreement to pay for merely pointing out some defect in the Chevrolet car or for any mere suggestion that they perfect the car by experimentation or improvement of their own working out, but if the plaintiff should submit a design with drawings and descriptions of his ideas, then, if the design was of sufficient interest to warrant investigation, an agreement would be made. As the plaintiff did not submit any "design" or "drawings and description of his ideas" or bring himself within the committee's proposal or offer, he cannot successfully claim a contract, even if he had an idea in which he had a property right and which he could make a subject of barter and sale. The correspondence shows that the minds of the parties never met on any proposed sale of plaintiff's ideas. The law will not imply a promise on the part of any person against his own express declaration. Municipal Waterworks Co. v. City of Ft. Smith (D. C.) 216 F. 431; Landon v. Kansas City Gas Co., 300 F. 351 (D. C.); Boston Ice Co. v. Potter, 123 Mass. 28, 25 Am. Rep. 9; Earle v. Coburn, 130 Mass. 596. In the latter case it is stated: "As the law will not imply a promise, where there was an express promise, so the law will not imply a promise of any person against his own express declaration; because such declaration is repugnant to any implication of a promise."

If, in fact, the defendants did derive benefit from the plaintiff's ideas that the units on their Chevrolet car should be shifted, and if their subsequent redisposal of some of the units to the other side of the car body was in any wise inspired by the plaintiff's idea, nevertheless, they are not indebted to the plaintiff, because they did not offer to make any agreement to pay for such mere suggestion as the plaintiff made, and their correspondence did not invite such a sugges-

tion. When plaintiff voluntarily divulged his mere idea and suggestion, whatever interest he had in it became common property, and, as such, was available to the defendants. Moore v. Ford Motor Co. (D. C.) 28 F.(2d) 529, affirmed (C. C. A.) 43 F.(2d) 685, 686; Larkin v. Penn. R. Co., 125 Misc. 238, 210 N. Y. S. 374; Bristol v. Equitable Life Assur. Soc., 132 N. Y. 264, 30 N. E. 506, 507, 28 Am. St. Rep. 568; Haskins v. Ryan, 71 N. J. Eq. 575, 64 A. 436; Id., 75 N. J. Eq. 330, 78 A. 566; Peabody v. Norfolk, 98 Mass. 452, 96 Am. Dec. 664; International News Service v. Assoc. Press, 248 U. S. 255, 39 S. Ct. 68, 63 L. Ed. 211, 2 A. L. R. 293; Hamilton Mfg. Co. v. Tubbs Mfg. Co. (D. C.) 216 F. 401, 404. In Bristol v. Equitable Life Assur. Soc., supra, the court stated: "Without denying that there may be property in an idea or trade secret or system, it is obvious that its originator or proprietor must himself protect it from escape or disclosure. If it cannot be sold or negotiated or used without a disclosure, it would seem proper that some contract should guard or regulate the disclosure; otherwise, it must follow the law of ideas, and become the acquisition of whoever receives it."

The judgment is affirmed.