**J. Walter COBB, Jr., d/b/a Cobbwood Plastics Co., Plaintiff,**

v.

**SOUTHERN PLASWOOD CORPORATION, Defendant.**

Civ. A. No. 672.

United States District Court
W. D. Arkansas,
Texarkana Division.

April 2, 1959.

over him can be obtained, within such time as the order may provide. * * *"

Shaver, Tackett & Jones, Texarkana, Ark., for plaintiff.

Smith & Sanderson, Texarkana, Ark., Hedgepeth, Ewing & Hedgepeth, Jackson, Miss., for defendant.

JOHN E. MILLER, Chief Judge.

On November 12, 1957, the plaintiff, J. Walter Cobb, Jr., filed his complaint against the defendant, Southern Plaswood Corporation, in which he alleged that prior to September 1956 he was engaged in research, and in the course of that work developed a process for the manufacture of dinette seats and other products from wood waste, and had located an immense market therefor.

In paragraph 3 of the complaint, he alleged:

"That on or about the 12th day of November, 1956, plaintiff and defendant entered into an agreement whereby plaintiff granted defendant the exclusive use of his idea, development, process, and market information, and whereby defendant agreed to manufacture and market these waste wood products as aforesaid and pay to plaintiff, for the use of his idea, development, process, and market information, 5 percent commission on the gross amount received from the sale of the products manufactured by defendant."

The plaintiff further alleged that the defendant went into production of the dinette seats as proposed by the plaintiff, but that on May 9, 1957, the defendant refused to continue to pay the plaintiff the commissions or royalties due under the alleged contract and that it has continued to manufacture the products in question, to the exact extent of which the plaintiff was unaware. The plaintiff prayed for damages in an amount equal to 5 percent on the gross sales of all such items manufactured, and further prayed that the defendant be required to account for such sales periodically, or in the alternative that the defendant be required to cease using the plaintiff's ideas.

In due time the defendant filed its answer, in which it denied that it had entered into any such contract as alleged, and specifically pleaded the statute of frauds as a defense to any contract alleged by the plaintiff. In addition, the defendant denied that it used any process developed by the plaintiff, and contended that it had entered into a contract with the plaintiff under which the plaintiff was to act merely as a sales representative and that such contract would be in effect only so long as it was mutually satisfactory to both parties.

A trial to a jury was waived, and the case was tried to the court on February 23 and 24, 1959. The court has considered the pleadings, the testimony, and all exhibits thereto, together with the briefs of the parties, and now makes and files its formal Findings of Fact and Conclusions of Law.

## Findings of Fact

### 1.

The plaintiff is a citizen of Tennessee and resides in the City of Memphis; the defendant is an Arkansas corporation with its principal place of business in Hope, Arkansas. The amount in controversy is in excess of $10,000, exclusive of interest and costs.

### 2.

In 1948 or 1949 the plaintiff, J. Walter Cobb, Jr., who had previously worked in an advertising business doing market research, announced that he had discovered a process by which wood waste, such as sawdust, could be utilized in the manufacture of wood products by the use of resins as binding agents. Mr. Roy Anthony of Hot Springs, Arkansas, was interested in disposing of wood waste, and after talking with Cobb, interested several businessmen in forming a corporation for the manufacture of pressed wastewood or "wood particle" boards. A corporation known as Cobbwood, Inc., was duly formed for that purpose. At that time the wastewood or "particle board" industry was new and few, if any, plants for its manufacture existed in the United States. Accordingly, Cobb was given 40 percent of the stock in Cobb-

wood, Inc., and was also hired at a salary by the corporation to manage the production of the particle board. A plant was built at Hope, Arkansas, and for sometime Cobb managed the plant, but commercial production was never achieved while Cobb was employed and he resigned and later established a business in Memphis, Tennessee, known as Cobbwood Plastics Company, which is described as "a research organization whose business it is to develop new items for manufacturers."

After Cobb's resignation, the investors in the original Cobbwood, Inc., secured the use of a slightly different formula for the manufacture of particle board or wood-waste products, and formed a new corporation known as the Southern Plaswood Corporation, the defendant herein. Southern Plaswood purchased the assets of Cobbwood, Inc., and went into production of particle board using the "Plaswood" process rather than the "Cobbwood" process.

Cobb, in the course of his work in Memphis, continued to study from time to time the use of wastewood products and the markets therefor. In the early fall of 1956 he thought he had conceived of a market for a dinette seat manufactured from wastewood which would be very profitable. He obtained from the defendant, Southern Plaswood Corporation, samples of the wastewood being used in their particle board product, and after testing concluded that their wastewood could be used for the manufacture of such dinette seats.

Thereafter, on October 30, 1956, he addressed a letter to the defendant,[1] in which he stated:

"Cobbwood Plastics is a research organization whose business is to develop new items for manufacturers. We do the development work, make market surveys, work up cost analysis as well as show potential profits.

In this particular case we have made an actual sale before placing the item for production.

"We are paid for our efforts on a small retainer fee plus a 5% commission on the sales our clients make after they go into production on our recommended items. We would like to bring to your office samples of the items we have developed and are proposing that you produce them using your facilities with little added equipment or changes in your present manufacturing. You will be under no obligation to us unless you decide to go into production on the items we present for your consideration." (Plaintiff's Exhibit No. 7.)

A meeting was arranged between the plaintiff, Cobb, and various authorized employees of the defendant which took place on November 2, 1956, at the defendant's plant at Hope, Arkansas. In the course of that meeting Cobb outlined his plan for the manufacture and sale of the particle board dinette seats and the market possibilities for such a product. At that time he submitted a typewritten memorandum which was a survey of the market, in which it was stated:

"We are prepared to handle the sales of these items on a commission basis or to turn the information we have gathered over to Plaswood without the selling being handled by our organization." (Plaintiff's Exhibit No. 8.)

In general, Cobb proposed to make sales, and preferred to handle sales himself because of his familiarity with the product. He also proposed to and did continue research from time to time, including testing work, which was used in selling the product. The contract which he contemplated involved continuing cooperation upon his part in the selling and, when necessary, in the manufacture of the product.[2]

1. The letters to and from the defendant are addressed to or signed by various employees of the defendant corporation, but, there is no dispute as to their authority, and in the interest of clarity the persons writing on behalf of the defendant are not individually identified in these findings.

2. The written contract proposed by Cobb

3.

The defendant was unwilling to enter into any contract without further investigation, but sent its engineer and plant manager to Memphis, where the experimental production in Cobb's laboratory was observed and where the plant engineer also discussed market possibilities with a proposed buyer. On November 6, 1956, the defendant wrote Cobb, referring to a telephone conversation of the same date, in which he advised that he would "take up with our board" the matter of selling wastewood dinette seats on a 5 percent commission basis, and advised Cobb that commitments in some territories prevented the defendant from giving Cobb "an exclusive arrangement." (Plaintiff's Exhibit 9.)

Some sample production was started in November, and on November 16, 1956, the defendant wrote Cobb that "in our board meeting yesterday, we discussed the matter of territory," and stated that it had sales representatives in various areas, but "we can give you exclusive in Memphis, and other areas. We suggest that you submit us a list of the concerns you would like to have exclusive on, and if there are any that we are already obligated to through our present representatives, we will scratch them off, and return the list to you, that we can give you the exclusive on." The letter further stated:

"The 5% commission is perhaps a little high for the volume in prospect, and yet we are willing to go along with you on this basis. We are to do the billing direct, and will have the right to accept or reject any orders submitted.

"Not knowing just what type of sales organization you have we cannot tie up indefinitely on a proposition of this kind, and it is rather difficult to frame a letter to give both of us the type of protection we want. A contract of course is based on

its giving satisfaction to both parties concerned, and we are willing to go on record as intending to work with you in this field, so long as a satisfactory volume of business is produced." (Plaintiff's Exhibit No. 14.)

4.

Production was started and various sales were made to purchasers obtained by Cobb, who was duly paid a 5 percent commission of those sales, but Cobb was silent on the proposition contained in the defendant's letter of November 16 that the "contract" would continue only so long as it gave "satisfaction to both parties."

However, he did write the defendant on November 28, 1956, reviewing his work in the field, asking for a written contract, and enclosing a copy which he asked defendant to sign. (Plaintiff's Exhibit No. 48.) This letter, inter alia, reiterated the original proposal that Cobb be paid a retainer fee plus a 5 percent commission on the sales, and stated:

"What we would like to have is an exclusive selling contract with Southern Plaswood on molded or fabricated parts, such as dinette seats and backs. This is a field that I do not think you have been working in. Since we have gotten you started in this field, we think we should have an exclusive in this field.

"I am enclosing a contract based on this expectation, and trust you will sign it and return it to me."

The proposed contract which was never executed by either party, reads as follows:

"This Agreement, Executed in duplicate this the —— day of November, 1956, by and between J. Walter Cobb, Jr., doing business as Cobbwood Plastics Company, of Memphis, Shelby County, Tennessee, first party, and Southern Plaswood

(but never executed) at a later date is set out under Finding No. 4. It specifi-

cally called for continuing performance upon Cobb's part.

Corporation, an Arkansas corporation of Hope, Arkansas, second party, Witnesseth:

"First party is a research and selling organization, engaged in developing new items, opening new markets, increasing sales and upgrading the quality of dinette seats; and second party owns manufacturing plant capable of manufacturing such articles.

"That the parties hereto, in consideration of the sum of One Dollar ($1.00) cash in hand paid by each party to the other, receipt of which is hereby acknowledged, and in consideration of the mutual advantages and gain resulting and to result from this agreement, do hereby agree as follows:

"First party has furnished second party with plans and information as to the manufacture, production and sale of dinette seats; and it is agreed that second party will pay to first party a commission of 5% on all sales of such dinette seats, to be based on the gross sales price of such seats; payment therefor to be remitted monthly, with copies of invoices as billed to customers. First party is to have the exclusive sales rights to all dinette seats and backs produced by Southern Plaswood Corporation during the next five (5) years. Second party further agrees to maintain production of such seats, reasonably sufficient to supply the demand therefor, to furnish first party with records of sales, and to exert its best and proper efforts toward making sales. First party agrees to cooperate with second party at all times, and to supervise the production and sales and distribution when and as requested by second party.

"The terms and provisions of this contract shall apply also to the supervision, production, sale and distribution of dinette backs.

"Executed this the day and year first above written.

Cobbwood Plastics Company

By:————————

J. Walter Cobb, Jr.

Southern Plaswood Corporation

By:————————"

(Plaintiff's Exhibit No. 48).

On December 8, 1956, the defendant's general manager advised Cobb that the contract which he had proposed would have to be discussed with the defendant's president, and that within the next few days defendant would advise Cobb "what we decide." (Defendant's Exhibit No. 2.) The defendant did not advise Cobb, and never signed the contract. Production continued and sales were made to purchasers obtained through Cobb.

On March 12, 1957, Cobb again wrote the defendant, referring to the proposed contract which he had submitted and stated, "so far I have not had a reply concerning the signing of the contract. Will you be so kind as to let me know just what I can expect in the way of a contract as we are now anxious to start contacting other accounts?" (Defendant's Exhibit No. 1.)

The defendant did not execute the proposed "royalty" contract and never advised Cobb that it would do so. It had never assented to the payment of a royalty, but only to a commission upon actual sales made by Cobb. The defendant understood the agreement to be as outlined in its letter of November 16, 1956, for a sales agency on a nonexclusive basis for a period terminable at the will of either party, and never agreed to or executed any other agreement.

5.

By virtue of the sale of a large portion of defendant's stock to the Emerite Corporation, there were various changes in the management and sales personnel of the defendant, and on May 9, 1957, Mr. Don Camper, then the new executive vice president of the defendant, visited Cobb

in Memphis, and at that time advised him that no further commissions would be paid to Cobb and that Cobb was no longer authorized to sell the defendant's product.

There is some dispute as to the reasons for the defendant's dismissal of Cobb, but in view of the court's determination of other issues, it is not necessary to determine the basis of the defendant's action in that regard.

Thereafter, although some sales were made by the defendant to various customers including customers originally obtained by Cobb, no commissions were paid to Cobb on any sales. The defendant handled the sales of all items through its regular salesmen, and paid a 5 percent commission to those salesmen instead of paying the commission to the plaintiff, Cobb.

### 6.

The ideas which Cobb presented to the defendant consisted of two elements: first, that the product could be molded from the wastewood or Plaswood formula, and, second, that there was a large market for such a product. Cobb did not offer any new formulas or production techniques. Prior to the discussion with Cobb the defendant had never manufactured any wastewood product except a "Plaswood" board in various dimensions which was used in several phases of the building industry. However, it was known in the wastewood industry in general that wastewood could be molded to form various products. Whether commercial production had been started elsewhere on the product conceived by Cobb, there had at least been samples of such products made from wood waste produced at at least one other plant, and the defendant's plant manager was aware of those samples. The defendant had also molded samples of other wastewood products, but had never engaged in commercial production of any product except its boards for use in the building industry until after the discussions with Cobb.

The defendant did not regard the ideas which Cobb presented as particularly novel, but was convinced after verifying Cobb's studies in both the market possibilities and production that the item should be produced at least on a trial basis, but at no time did the defendant intend or agree to pay a 5 percent royalty on all items sold.

After terminating the contract with Cobb on May 9, 1957, the defendant continued to manufacture the product proposed by Cobb, and at a later date obtained additional equipment to facilitate such manufacture; but since May 9, 1957, the defendant found production of these items unprofitable and in November 1958 stopped production of such items altogether. The defendant has not made any profit on such items since May 9, 1957. The amount of its gross sales of such items is not in evidence. All commissions on sales made by Cobb have been paid to him.

### Discussion

The sole issue raised by the plaintiff's complaint and the evidence at the trial is whether there was a contract between the parties and a breach by the defendant, and, if so, whether the Statute of Frauds barred any action thereon. Both parties, however, cite the case of E. L. Bruce Co. v. Bradley Lbr. Co., D.C. W.D.Ark.1948, 79 F.Supp. 176, decided by this court, in which the court held that equity did not permit one to unjustly enrich himself at the expense of another by the unauthorized use of a trade secret. No issue was made upon this theory. The plaintiff did not allege any basis for recovery under a claim of tort, quasi-contract or unjust enrichment, but made his claim solely upon the alleged contract.

The court does not, therefore, understand the plaintiff to be claiming under any theory other than that the alleged contract was breached by the defendant. However, because the issue was discussed in the briefs of the parties, the court notes that the plaintiff could have no claim to any remedy except one based upon contract.

It is true, of course, that an idea, even though not patentable or subject to copyright, may be protected from use by one to whom it is revealed in confidence provided that the idea is reduced to concrete form, is novel, and that the plaintiff expects payment for the use thereof. See Sandlin v. Johnson, 8 Cir., 1944, 141 F.2d 660; Lueddecke v. Chevrolet Motor Co., 8 Cir., 1934, 70 F.2d 345; Belt v. Hamilton Nat. Bank, D.C.D.C.1952, 108 F.Supp. 689; Case Note, 8 Ark.L.Rev. 186 (1954); Annotation, 170 A.L.R. 449.

However, many courts also have held that disclosure of an idea, absent contractual protection, makes the idea common property available to the defendant without obligation. See Lueddecke v. Chevrolet Motor Co., supra, and cases cited. Others have held that limited disclosure to the defendant does not dissolve the right to legal protection. Belt v. Hamilton Nat. Bank, supra. Assuming that the language of the Court of Appeals for the Eighth Circuit in the Lueddecke case, to the effect that disclosure destroys the property right in the idea, is dicta, the plaintiff still has no protection in his "idea."

In the first place, there was not the required confidential relation existing between plaintiff and defendant when he first revealed his ideas in November 1956. It is true that something considerably less than a fiduciary relationship between the parties may be such a confidential relationship as will furnish protection for the use of the idea disclosed. Probably proof that the plaintiff offered the idea upon condition of confidence and a clear understanding that payment would be made upon use would suffice in some instances. But even such minimal proof was not offered by the plaintiff. On the contrary, the plaintiff's expectation could have been and was understood by the defendant as being an expectation that he would be paid for making some sales of the product, and that much he received. Within two weeks of the original disclosure of the "idea" the defendant indicated its willingness to go along with a sales contract only—and that for only so long as it was mutually satisfactory. Yet the plaintiff, although he did later ask on two occasions for a "royalty" contract, never referred to any confidence or earlier binding agreement. He never asked defendant to respect any "confidence" by ceasing production. No confidential relationship existed between the parties. The plaintiff simply made his disclosures as an inducement to the defendant to enter into a sales contract.

Moreover, there was no novelty in the "idea" which the plaintiff offered. The defendant had previously molded several products. Although it had not gone into commercial production, the idea of molding particle board was not new, either to the defendant or to the wood-waste industry in general. The idea of molding of dinette seats as a particular product was not new. Defendant's plant manager had seen samples of dinette seats at a New Hampshire wood-waste plant previously.

It therefore appears that no claim could arise under any theory of unjust enrichment or quasi-contract, even if the plaintiff were making such a claim.[3]

The sole issues raised by the complaint and the answer are whether or not there was a contract between the plaintiff and defendant and, if so, whether an action may be maintained for a breach of the alleged contract. The Statute of Frauds, Ark.Stat.Ann. Sec. 38–101 (1947), provides in part:

"No action shall be brought; * * sixth, to charge any person upon

---

3. Possibly a claim of quasi-contract could not be allowed in any event where both parties are insisting upon an oral or written contract. since "The law will not imply a promise on the part of any person against his own express declaration * * *. 'As the law will not imply a promise, where there was an express promise * * *.'" Lueddecke v. Chevrolet Motor Co., 8 Cir., 1934, 70 F.2d 345, at page 348. But in view of the court's findings upon the other issues, it is not necessary to consider this question.

any contract, promise, or agreement, that is not to be performed within one year from the making thereof; unless the agreement, promise, or contract, upon which such action shall be brought, or some memorandum or note thereof, shall be made in writing, and signed by the party to be charged therewith * * *."

The plaintiff asserts that the letters and related documents passing between the plaintiff and defendant are sufficient written memoranda to take the contract out of the Statute of Frauds. In particular, the plaintiff argues that the defendant's letter of November 16, 1956 (Plaintiff's Exhibit No. 14), is a memorandum which corroborates the alleged royalty contract. However, a review of that letter, which refers to a "5% commission," readily demonstrates that it is as consistent with the defendant's theory of the contract as with the theory of the plaintiff. The defendant insists that the contract was merely a contract for a sales commission of 5 percent upon sales made by the plaintiff. In some respects the letter of November 16 is more consistent with the defendant's theory of the contract than with that of the plaintiff in that the plaintiff contended for the right to a royalty upon all sales made and an exclusive right to unlimited territory for sales. The letter of November 16 expressly negated any exclusive selling agreement with the plaintiff, and further indicated "we cannot tie up indefinitely on a proposition of this kind."

Of course, as the plaintiff asserts, a series of letters considered together may be found to constitute written evidence from which the whole contract can be made out. St. Louis, I. M. & S. Ry. Co. v. Beidler, 1885, 45 Ark. 17; Coley v. Hall, 1943, 206 Ark. 419, 175 S.W.2d 979. But the written memorandum or memoranda relied upon for compliance with the Statute of Frauds must contain all essential provisions of the alleged contract. This is the rule in St. Louis, I. M. & S. Ry. Co. v. Beidler, supra, and has been consistently followed since that time by the Arkansas Supreme Court. Littell v. Jones, 1892, 56 Ark. 139, 19 S.W. 497; Briggs v. Frazer, 1923, 157 Ark. 518, 249 S.W. 9; Blodgett Const. Co. v. Watkins Lbr. Co., 1923, 158 Ark. 75, 249 S.W. 574; Tate v. Clark, 1941, 203 Ark. 231, 156 S.W.2d 218; Lindsey v. Hornady, 1949, 215 Ark. 797, 223 S.W. 2d 768.

In Wyatt v. Yingling, 1948, 213 Ark. 160, at page 162, 210 S.W.2d 122, at page 123, the court quoted with approval 49 Am.Jur., Statute of Frauds, Sec. 354, as follows:

"'It is not sufficient that the note or memorandum express the terms of a contract; it is essential that it completely evidence the contract which the parties made by giving all of the essential terms. The writing must be such that all of the contract can be collected therefrom; resort cannot be had to the terms of the oral contract to supply deficiencies in the memorandum. * * * A contract in writing which leaves some essential term thereof to be shown by parol is only a parol contract and is, therefore, not enforceable under the statute of frauds.'"

The series of letters between the plaintiff and defendant indicates that the plaintiff offered his ideas to the defendant as an inducement for a promise or contract with defendant under which the defendant would pay him a 5 percent commission "on the sales our clients make after they go into production," or, in other words, a royalty of 5 percent. However, before any production was started, the defendant clearly indicated that a royalty contract was not acceptable to it. In its letter of November 16 it even stated that a contract for an indefinite time would not be satisfactory and, of course, that is inconsistent with the royalty claim of the plaintiff. Subsequent letters indicate that even as late as March 1957 neither party believed that a contract was in existence except a contract for a sales commission on sales made by plaintiff. It is apparent from the letters passing between the

parties that the letters signed by the defendant's employees are as consistent with its version of the contract, as a sales contract, as with the plaintiff's version, as a royalty contract. Furthermore, none of the letters passing between the parties purport to contain all of the terms of the alleged contract. They refer to a 5 percent commission but do not indicate whether that commission is to be paid upon the gross sales or upon net profit. The only conclusion available to the court is that the letters relied upon by the plaintiff as memoranda which take the alleged contract out of the Statute of Frauds do not contain all of the essential provisions of the alleged contract and, accordingly, are not sufficient memoranda to avoid the application of the statute. It goes almost without saying that if the memoranda relied upon are as consistent with one version of the contract as with the other, certainly essential terms are missing.

▬▬▬ The plaintiff argues that if the memoranda relied upon do not take the alleged royalty contract out of the terms of the Statute of Frauds, that the alleged contract is nevertheless enforceable because it could be performed within one year. If the plaintiff were asserting a contract for commissions terminable at the will of either party, which contract is admitted by the defendant, this rule would clearly be applicable. The rule was stated in the early and much cited case of Meyer v. Roberts, 1885, 46 Ark. 80. There the court said at page 84 of 46 Ark.:

"The decisions upon this clause of the statute cannot all be reconciled. But ever since the case of Peter v. Compton, Skinner, 353; S. C., 1 Smith's Lead.Cas., 8th ed. 614, it has been considered settled that the statute applies only to agreements which appear from their terms to be incapable of performance, or such as the parties never contemplated should be performed, within the year. Consequently, where the duration of the agreement depends upon a contingency, as the

death or marriage of one of the contracting parties, a note in writing is not necessary; for the contingency may happen, and thus the contract be fully performed, within a year from the time it is made. So a contract determinable at any time by either party, is a contract which is to last during the pleasure of the parties or so long as they are mutually satisfied.

"But a contract for personal services to continue and hold the parties together for a longer period than one year is plainly within the statute."

If there is a possibility that the performance called for by the terms of the contract could be completed within one year, even though it is probable that completion would require a longer time, the Statute of Frauds is not applicable and the contract is enforceable. Reed Oil Co. v. Cain, 1925, 169 Ark. 309, 275 S.W. 333, and cases cited. Furthermore, where the contract itself does not specify a time for completion of performance, "it will be implied that a reasonable time for performance was intended." Friedman v. Schleuter, 1912, 105 Ark. 580, 151 S.W. 696, 698. It appears that the intention of the parties as to whether the performance is to be completed within one year is not always controlling. See, Annotation, 129 A.L.R. 534, 538. However, the Supreme Court of Arkansas seems to be committed to the proposition that if the parties never contemplated that performance was to be due within one year, the Statute of Frauds will apply. Reed Oil Co. v. Cain, supra; Mitchell v. Hanley, 1926, 171 Ark. 456, 284 S.W. 535. Thus the rule is that if the alleged contract is incapable of performance under its terms within one year, or if the parties contemplated no performance within one year, the Statute of Frauds applies to bar suit upon the alleged contract. There is an exception to the effect that where the duration of the agreement depends upon a contingency which may happen within one year, the Statute of Frauds does not apply. See Meyer v. Roberts, supra. It should be

noted that the exception for contingencies does not apply unless the contingency is a part of the alleged oral contract or is necessarily implied, and the happening of the contingency must satisfy the terms of the contract rather than merely render it impossible of performance or excuse performance. See Restatement, Contracts, Sec. 198 (1932), and illustrations.

Assuming that a contract as alleged by plaintiff was entered into and that the terms of such alleged contract were sufficiently definite to permit enforcement, it necessarily contemplated a continuing and indefinite relationship. The plaintiff's version of the contract is that it was for a 5 percent royalty on all sales of the defendant's product, and a reasonable time for such royalty where there was no specification of time would certainly be in excess of one year. If the proposed contract submitted by the plaintiff to the defendant, but never executed by either party, can be taken as a guide to elucidate the terms of the alleged oral contract, then the period of the contract was, as specified therein, 5 years. In either event, the time contemplated by the parties for performance extended over a period in excess of one year. The plaintiff contends that performance could have been completed within the one-year period. The terms of the alleged contract as claimed by the plaintiff, however, do not permit such a construction. The plaintiff under his contention was to be paid royalties on all sales of the product. It is true that the defendant might cease production of the product within one year, but the obligations of the contract would remain in force, and the defendant would be required, if such a contract existed and was valid, to pay the royalty in the event production should be resumed.

In other words, the contract obligations would not be terminated by the mere cessation of production within one year. No performance would be due so long as production were stopped, but production might resume, and, if so, further performance would be called for on both sides. The plaintiff himself would have obligations under the contract at any time production was being made, to assist in plant manufacture problems and in sales. In Reed Oil Co. v. Cain, supra, the Court held that where performance could be completed within one year, the Statute of Frauds did not apply, even though the *amount* of compensation would be determined by events unrelated to the contract which could not be completed in less than three years. That case has no application here, because performance on either side under the contract alleged by the plaintiff could not be completed within the one year. In other words, the contract alleged by the plaintiff, if it existed, contemplated the existence of obligations which could not be discharged under the contract within a period of less than one year. It was not merely a contract whereby the payment would be determined later, as in the Reed case. The plaintiff proposed a written contract which itself indicated a five-year period, and the plaintiff has never limited his claims in this suit to a period of one year. It is apparent, therefore, that unless some contingency which might happen within one year and under which the performance of the contract could be fully completed within one year, the Statute of Frauds is applicable. There is no indication of such a contingency. It is possible, of course, that the defendant corporation might be dissolved or go into bankruptcy within one year. Such possibilities exist in every contract, but they are not contingencies which render the contract fully performed upon their happening. Such possibilities may render performance impossible but performance is no less due under the terms of the contract, and even though contingencies may arise under which performance may be *excused* by the happening thereof, such excuse for performance does not render the contract "fully performed." Therefore, the fact that an excuse for performance may occur within one year does not take the alleged contract out of the Statute of Frauds. See, Restatement, Contracts, Sec. 198, Comment (c).

The court concludes that the alleged oral contract for royalties, if it existed, was not capable of performance within one year and that the parties never contemplated performance within one year. There was no contingency which might occur within one year which would render the contract fully performed within that period. The Statute of Frauds is, therefore, applicable to the alleged oral contract for royalties.

■■■■■■ The plaintiff argues that if the Statute of Frauds is otherwise applicable, his part performance of the contract nevertheless satisfies the statute and renders it inapplicable to this case. He does not allege or contend that he has fully performed the alleged contract, and it is therefore unnecessary to decide whether full performance upon his part would sustain his contentions. It is clear that part performance does not. The Supreme Court of Arkansas seems now committed to the rule stated in Ozan Lumber Co. v. Price, 1952, 219 Ark. 709, at page 712, 244 S.W.2d 486, at page 488, where the court said:

"It is generally well established that part performance is an equitable defense and may be shown only in equity, or in a law case, as a license for possession."

In Mitchell v. Hanley, 1926, 171 Ark. 456, at page 458, 284 S.W. 535, at page 536, the court said:

"This court has held that the statute applies only to agreements which appear from their terms to be incapable of performance within a year, or such as the parties never contemplated should be performed within that time. Johnson v. Cheek, 163 Ark. 176, 259 S.W. 368, and Reed Oil Co. v. Cain, 169 Ark. 309, 275 S.W. 333, and cases cited.

"It is true that there was partial performance of the oral contract sued on, but this court has held that partial execution has no effect at law to take any case out of the provisions of the statute. Henry v. Wells, 48 Ark. 485, 3 S.W. 637.

"Again, in Oak Leaf Mill Co. v. Cooper, 103 Ark. 79, 146 S.W. 130, it was held that a parol contract for personal services for a period longer than one year is within the statute of frauds, and no action can be maintained on it, and if the employee enter upon its performance and is afterwards discharged, the employer is liable only for his wages for the time he served."

In White v. Southern Kraft Corp., 8 Cir., 1942, 132 F.2d 381, on page 382, the court said:

"As to the contention that part performance by appellant will satisfy the statute. Although part performance may, in equity, remove a contract from the statute (Williams v. Dumas, 197 Ark. 1011, 126 S.W. 2d 934, 936), the decisions of the Supreme Court of Arkansas may not be entirely harmonious as to whether this is true where the action is one at law. Be this as it may, the latest announcement of the Court holds that part performance cannot avoid the statute. Mitchell v. Hanley, 171 Ark. 456, 284 S.W. 535, 536.

"The judgment must be and is affirmed."

The Uniform Sales Act, Ark.Stat.Ann., Sec. 68–1404 (1947), contains a separate "Statute of Frauds" relating to the sale of goods in excess of the value of $30.-00, and that statute specifically provides that part performance of such a contract may render the statute inapplicable. There is no such provision contained in Ark.Stat.Ann., Sec. 38–101, relating to contracts not being performed within one year, and as noted, except in equity, part performance is not a substitute for compliance with the Statute of Frauds. In Radio Corp. of America v. Cable Radio Tube Corp., 2 Cir., 1933, 66 F.2d 778, at page 785, the court in an opinion by Judge Augustus Hand, stated the rule as follows:

"It is well settled that oral contracts that are not to be performed

within a year are not taken out of the statute by part performance except in certain cases in which real estate is involved or in which specific performance would be decreed. (Citing numerous cases.) The present situation seems just the sort of one the statute was intended to cover."

See also 49 Am.Jur. Statute of Frauds, Sec. 419 et seq.; 37 C.J.S. Frauds, Statute of § 254.

Under the rule of these cases as followed by the Supreme Court of Arkansas, the part performance, if any, will not validate an oral contract not to be performed within one year. Therefore, it is unnecessary to determine whether the alleged part performance was referable to the contract and explicable only in the light thereof, and whether the plaintiff had relied thereon to his detriment. It might be noted in passing, however, that the part performance of the plaintiff, if any, is as easily explained by the defendant's version of the contract as by the plaintiff's.

In any event, the court is unable to find from the evidence the contract contended for by the plaintiff. The series of communications between the parties clearly indicates that the defendant did not accept the plaintiff's terms, because it refused to execute the contract submitted by the plaintiff. Furthermore, all of the defendant's letters to the plaintiff which are relevant to the point refer to his sales territory. While the plaintiff in his earliest communications indicated that he was seeking "5% commission on sales" of the product, which possibly meant a 5 percent royalty on *all* sales, his later communications make no such indication in spite of the fact that the defendant had not executed the plaintiff's proposed contract.

In this connection, it will be remembered that on November 28, 1956, the plaintiff wrote the president of defendant (Plaintiff's Exhibit No. 48), in which he reviewed to some extent the prior negotiations and conversations between himself and the officials of the defendant, and concluded that letter as follows:

"What we would like to have is an exclusive selling contract with Southern Plaswood on molded or fabricated parts, such as dinette seats and backs. This is a field that I do not think you have worked in. Since we have gotten you started in this field, we think we should have an exclusive in this field.

"I am enclosing a contract based on this expectation and trust you will sign it and return it to me."

On December 8, 1956, the general manager of the defendant acknowledged receipt of plaintiff's letter of November 28, in which the general manager said:

"Your letter with which you enclosed proposed sales contract was received just as I was leaving for a trip east and I took it along with me to go over and since my return have not had an opportunity to discuss the matter with Roy Anthony. We will be going into the matter within the next few days and will let you know what we decide." (Defendant's Exhibit No. 2.)

On March 12, 1957, the plaintiff wrote the president of the defendant relative to the contract and stated:

"On November 28, 1956, I wrote to you and enclosed a contract to cover our selling activities. On December 8 you wrote that you had received the proposed sales contract and would write to me later on about it. So far I have not had a reply concerning the signing of the contract. Will you be so kind as to let me know just what I can expect in the way of a contract as we are now anxious to start contacting other accounts." (Defendant's Exhibit No. 1.)

Thus, it conclusively appears that the plaintiff recognized as late as March 12, 1957, that he had no contract such as he now alleges with defendant, but only a

**704**

contract for commissions on such products as he might sell.

The court concludes that the only contract between the plaintiff and defendant was one for a sales commission upon all sales made by the plaintiff. All such commissions have been fully paid, and the contract was terminable at the will of either party.

### Conclusions of Law

**1.**

The court has jurisdiction of the parties and the subject matter herein.

**2.**

An oral contract existed between the plaintiff and defendant under the terms of which the plaintiff was given the exclusive right to sell the product in Memphis and in other areas where the defendant was not represented by salesmen and to receive a 5 percent commission therefor. Such contract was terminable at the will of either party, and was terminated May 9, 1957. No commissions are due the plaintiff thereunder.

**3.**

The plaintiff did not enter into any contract with the defendant for royalty, and no contract was entered into by the parties other than as set forth in paragraph 2 above.

**4.**

In any event, any contract such as alleged by the plaintiff would be barred by the Statute of Frauds, and the letters and other writings in evidence are not a sufficient memorandum to take the contract out of such statute. The contract alleged by the plaintiff was not to be performed within one year, and part performance of such an alleged contract does not remove it from the operation of the Statute of Frauds.

**5.**

The plaintiff is not entitled to recover damages or to an injunction, and his complaint should be dismissed with prejudice.

A judgment in accordance with the above is being entered today.