**Robert S. VAN RENSSELAER and Edna E. Van Rensselaer, Plaintiffs,**

**v.**

**GENERAL MOTORS CORPORATION, a corporation organized and existing under and by virtue of the laws of the State of Delaware and transacting business in Michigan, Defendant.**

**Civ. A. No. 20833.**

United States District Court
E. D. Michigan, S. D.

Sept. 27, 1962.

Robert S. Van Rensselaer and Edna E. Van Rensselaer, in pro. per.

Harold A. Sleeper, Detroit, Mich., Frank DeMarco, Jr., Los Angeles, Cal., of counsel, for plaintiffs.

Aloysius F. Power, Detroit, Mich., (Jean L. Carpenter and George W. Coombe, Jr., Detroit, Mich., of counsel), for defendant.

TALBOT SMITH, District Judge.

Plaintiffs have brought this action against the General Motors Corporation, defendant, hereinafter referred to at times as the Corporation, for damages for alleged pirating of plaintiffs' devices and ideas, submitted by plaintiffs to it. These devices and ideas concern such articles as sun visors and reclining seats, together with exploratory and descriptive material relating thereto, stressing comfort, leg room and roominess. Motion for summary judgment under Rule 56 has been brought by defendant. It is the judgment of the Court that it must be granted. Viewing the allegations of the complaint, affidavits, depositions and

exhibits in the light most favorable to plaintiffs and against the moving party-defendant there exists no genuine issue of material fact.

In more detail, and as so construed, the relevant facts are as follows: Plaintiff Edna Van Rensselaer states upon deposition (p. 43) that she was one " * * * of a large group of people at the [Los Angeles, 1954] Motorama, and there were many executives there, including Mr. Curtice [then President of the Corporation]. He was very friendly to everyone. The people were asking him questions about the cars exhibited at the show, and he said that since California purchased so many cars—I believe perhaps ten per cent of the total output of General Motors—it proved that the state was very car conscious, and that General Motors would welcome ideas and suggestions and devices from car-conscious Californians."

Later that year, Mrs. Van Rensselaer wrote to Mr. Curtice a letter stating, in substance, that " * * * I have some practical ideas to further enhance the appointments and comfort of future models. Because Cadillac is my favorite car, I should like to offer these ideas to you first * * * Please let me know immediately if you are interested to the extent of conferring with me." (Defendant's Exhibit 1) [1]

Reply was made thereto (Exhibit 2) as follows:

"Miss Edna Van Rensselaer
"245 South Larchmont Blvd.
"Los Angeles 4, California
"Dear Miss Van Rensselaer:

"We have your letter of September 22 in regard to a device.

"General Motors has an established procedure for the consideration of such matters. This is outlined in the enclosed pamphlet. Your attention is particularly called to the paragraphs in italics on pages 2 and 3 and to the paragraph entitled 'Limitations Upon New Devices Operations.' "

The pamphlet enclosed (Exhibit 3) entitled "New Devices Activities of General Motors" had as its purpose, to quote therefrom, "to explain, in more detail than would be possible in a personal letter, the proper procedure to be followed in submitting inventions to General Motors and the policies of the Corporation in considering these".

This pamphlet, Exhibit 3, emphasized in italics on page 2 the following as to confidential relationships between those submitting ideas and the Corporation:

"No device, plan, idea or suggestion may be received 'in confidence' and no 'confidential relation' may be established with a submitter."

Moreover, with respect to the obligation of the Corporation as to such suggestions, the following was italicized on page 3:

"No obligations with respect to any device or design may be entered into which would imply any restriction on General Motors activities that is not provided by the United States Patent Laws."

We note, in passing, the Chrysler Corporation's similar notification, found in Hisel v. Chrysler Corp. (W.D.Mo.1951), 94 F.Supp. 996, (motions for summary judgment granted) :—

"You * * * release it [Chrysler] from any liability in connection with your suggestion or liability because of use of any portion thereof, except such liability as may accrue under valid patents now or hereafter issued." 94 F.Supp. 996, 998.

Other pertinent portions of the General Motors pamphlet appear in the footnotes hereto.[2]

---

1. All exhibits herein referred to are those identified by plaintiffs in their depositions and forming a part thereof.

2. "WHAT ARE NEW DEVICES? The activities of the New Devices Section are limited to things for which patent protection is, or would be, offered for sale.

"This does *not* include articles which are to be supplied to General Motors by an outside manufacturer. Such articles should be brought to the attention

Subsequent thereto plaintiffs (stating on deposition, and in the covering letter of January 17, 1955, that they intended to comply with the Corporation's reply letter (Exhibit 2)) forwarded their submission to the Corporation, together with covering letters dated January 17, 1955, (Exhibit 4), January 22, 1955, (Exhibit 5), and February 14, 1955, (Exhibit 6). The submission contained illustrations of six suggested devices for use in automobiles, together with explanations of those devices, as well as two envelopes containing news clippings and advertisements believed to evidence the need for such devices. These devices, originally six in number, have, by stipulation of counsel, been reduced to four, namely:

"Device No. 1—'a Sunshade visor or visors extending all across the windshield and around the top and sides and rear of a motor car.'" Count One, ¶ V(1);

Device No. 2—"a device making the positions of the back of the front seat and the back of the rear seat of an automobile recline or tilt, subject to push button control." Count One, ¶ V(2);

Device No. 5—"a design or invention, * * * consisting of a Dome

of the manufacturing Divisions of General Motors, as each Division has authority for the purchase of whatever equipment and materials are needed in its activities. This does *not* include ideas which are of an unpatentable nature. General Motors cannot and does not offer rewards for ideas or devices which cannot be legally protected.

"WHAT PROTECTION IS NECESSARY? General Motors wants every inventor to protect himself before submitting any device.

"An issued patent or a patent application is, of course, the most satisfactory form of protection. If a person does not wish to take this step until a later date, however, General Motors will consider a device where the sketches and description of it have been dated and witnessed, preferably before a notary. This should be done in duplicate, and the original copy retained by the inventor.

"Inventors residing outside the United States should file a patent application before submitting a device to General Motors.

"WHAT TO SUBMIT. The inventor should submit such descriptive material as will enable an engineer to understand fully the construction and operation of the device in question. This material should include an explanation by the inventor of what he believes to be new in the device and what its advantages may be over present practice.

"Copies or the numbers of patents, and copies of patent applications, are probably best for this purpose, but adequate sketches and a clear, written description are entirely satisfactory.

"Inasmuch as it is necessary that a complete record be kept of each device considered, *no material will be returned.* Therefore it is urged that duplicates only be submitted, the inventor retaining the original copy himself. An additional reason for this policy is that, with the thousands of inventions received, many of which must be referred to several Divisions for examination, it is unavoidable even with the utmost care that some material may be lost in the mails or otherwise. We cannot assume responsibility for such loss.

"Models are unnecessary where adequate drawings and descriptions are supplied, and are likely to be damaged or lost in shipment. The Corporation cannot accept any responsbility for any loss or damage. Full scale working samples demonstrated as part of a complete mechanism or vehicle are sometimes useful, but the expense is not usually justified.

 \* \* \* \* \*

"LIMITATIONS UPON NEW DEVICES OPERATIONS. Certain limitations, in addition to avoiding entering into confidential relations, as previously mentioned, have been placed upon the New Devices Section by the management of General Motors.

"No agreement or contract of any kind will be entered into by anyone in the Corporation until after a careful investigation following a complete disclosure of the device.

"No reason for the rejection of a device can be given. One important reason for this is the necessity of avoiding discussion of future plans of General Motors.

"No member of the New Devices Staff may attempt to act in any sort of consulting capacity in regard to inventions. This includes advice regarding patentability, the desirability of patenting, or commercial possibilities outside of General Motors." (All emphasis in original)

Reading Light." Count One, ¶ V (5);

Device No. 6—"a design or invention * * * consisting of the 'Cadillac Sun-Shade Model Flight-mobile Sedan' or Town and Country Station Wagon, (Sun-shade visors 'Built-in' top)." Count One, ¶ V(6).

In connection with the above-described devices the Complaint also alleges the submission of certain "notarized explanatory, descriptive 'comfort theme' device material". Count One, ¶ V(1). There is a great deal of confusion in the record as to whether such descriptive data stressing the "comfort theme" represents material merely explanatory of the described devices, or whether it constitutes a separate submission. The deposition of plaintiff Edna Van Rensselaer looks at times both ways.[3] In this situation, for the purposes of this motion, the Court will consider the descriptive material not as merely explanatory of and collateral to the described devices but as constituting a separate and independent submission.

The last of the covering letters above referred to, that of February 14, 1955, closed with the words "I would also appreciate knowing as soon as possible whether General Motors is interested in tendering an offer for the same".

It was clear that General Motors was not so interested. The devices were rejected unequivocally in letters dated February 10, 1955 (Exhibit 7), and March 17, 1955 (Exhibit 8). The first letter, that of February 10, after acknowledging receipt of the "proposed ideas" stated "Although we sincerely appreciate your interest in the automotive industry and

in our Corporation in particular, after a careful study of the material pertaining to your retractable sun visors, reclining seats, leg rests, built-in baby seat, and reading light, it has been concluded that General Motors is not interested in acquiring rights to any novel or patentable features that may be present in any of these arrangements. I would like to point out that all of these ideas are generally old and devices similar to those described in your portfolio have been previously considered by our engineers. We regret that we cannot give you a more favorable reply, and thank you for bringing your devices to our attention."

The Corporation's second rejection, that of March 17, was equally clear: "The New Devices Section of General Motors has received your letter of February 14 to Mr. Harlow H. Curtice and the drawings and descriptive material enclosed with your letter. By now you have probably received our letter of February 10 reporting that General Motors did not find any interest in the devices described in your portfolio.

"The material pertaining to your car top and visor arrangement has been carefully considered, and it has been concluded that General Motors is not interested in acquiring any rights which you may hold in this connection.

"We sincerely appreciate your courtesy in bringing your devices to our attention, and regret that we cannot give you a more favorable reply."

Plaintiffs, however, persisted in their correspondence, soon making it clear that certain claims were, or were to be, asserted. Thus, only a few days after the Corporation's rejection letter of March

---

3. Compare plaintiffs' deposition pp. 108 and 168:

P. 108 "Q And that is all we are talking about in this Complaint—the six specific devices?

"A That's right."

P. 168 "Q All right, fine. Now, do you claim that any reference in General Motors' advertising to increased spaciousness or comfort in connection with any of

its automobiles is an appropriation of your Device No. 6?

"A Yes, I do.

"Q Do you claim that any change in styling by General Motors so as to enlarge the outside dimensions of the car or the inside dimensions of the car represents an appropriation of your idea?

"A Yes, I do."

17, we find the plaintiffs advising defendant in the following terms:

" * * * I would like to make it clear that if you incorporate any of these devices now or in future model cars it will prove that you deemed it advisable to do so from the *knowledge* you gained from my *original, informative* Summary, Analysis, Description, and Comprehensive Survey of what the general public desires in cars * * * " (Exhibit 9) (Emphasis in original)

With respect, also, to the descriptive material submitted, similar claims were voiced by the plaintiffs. It was asserted that the Corporation was using plaintiffs' advertising ideas (stressing comfort and interior spaciousness in its advertising, which ideas, plaintiffs assert, were intended to be used only in advertising their own submitted devices. This is perhaps best expressed in Exhibit 16 (letter dated July 29, 1955) in the following terms:

"I reiterate that the THEME of my explanatory and descriptive device material is Comfort, interior spaciousness, roominess, leg room, head room, hip room, shade, etc. *intended by me* to be used *only* for the purpose of describing General Motors cars when my said devices were incorporated *in* General Motors cars. And as of and up to the date of this letter mounting evidence shows that my material is still being misappropriated by General Motors to advertise *1955 cars* without my devices." (Emphasis in original)

Also, by letter dated March 13, 1956, (Exhibit 24) plaintiffs urge their claim concerning appropriation by the Corporation of advertising ideas apart from the devices themselves:

"Appropriation by all divisions of General Motors of said explanatory descriptive device material without purchase of same from my husband and me to date is a violation of our property rights."

Such are the outlines of the controversy. It would be possible to cite more detail, the correspondence being voluminous and the exhibits well over a hundred in number, but enough has been stated to present the issues now before the Court.

We approach the problems presented having in mind the purpose of Rule 56 to eliminate trial in those actions where there is no genuine (as opposed merely to a formally pleaded) issue as to any material fact. In order to separate "what is formal or pretended * * * from what is genuine and substantial"[4], a party is permitted "to pierce the allegations of fact in the pleadings and to obtain relief by summary judgment where facts set forth in detail in affidavits, depositions, and admissions on file show that there are no genuine issues of material fact to be tried".[5]

As to jurisdiction and the substantive law applicable, this case is governed by 28 U.S.C. § 1332. There is no federal question involved and the rights of the parties are governed by the substantive law of the state. Erie R. Co. v. Tompkins (1938), 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. The Complaint sets forth, in Paragraph IV of Count One, that the Corporation's response to plaintiffs' letter to Mr. Harlow H. Curtice, above referred to, obligated General Motors to purchase "any devices or designs of whatsoever nature which after submission * * * were found acceptable" by the Corporation. Regardless of how the word "offer" is bandied about by these parties in their pleadings and briefs it is uncontrovertible that General Motors was to have the privilege of either rejecting or accepting the plaintiffs' submissions. Indeed, it is pleaded in Paragraph VI of Count One that plaintiffs' submissions were answered "with rejection letters". Obviously, either rejection

---

4. Cardozo, J., in Richard v. Credit Suisse (1926) 242 N.Y. 346, 350, 152 N.E. 110, 45 A.L.R. 1041.

5. 6 Moore's Federal Practice, 2d ed., ¶ 56.04 [1].

or acceptance could occur only at the place of business of the defendant, namely, Detroit, Michigan, to which plaintiffs' submission was directed and where it was received, considered, acted upon, and rejected.

■ Accordingly, any express or implied in fact contractual obligation is governed by the law of Michigan, the state where any "acceptance" by defendant of plaintiffs' submission occurred. (See Restatement, Conflict of Laws § 323 [1934])

■ Any quasi-contractual cause of action as pleaded under Count Two of the Complaint also would be governed by the law of Michigan. In this connection, the Restatement (ibid.) states:

" § 452. Right Resulting from Conferring Benefit.

"The law of a place where a benefit is conferred determines whether the conferring of the benefit creates a right against the recipient to have compensation.

" § 453. Duty Resulting From Unjust Enrichment.

"When a person is alleged to have been unjustly enriched, the law of the place of enrichment determines whether he is under a duty to repay the amount by which he has been enriched."

This general approach is confirmed by the commentaries. Thus, Beale states: "It seems clear that a right arising on quasi contract is determined by the place where the benefit or other enrichment is rendered." 2 Beale, Conflict of Laws 1429.

We will first examine Count One, wherein plaintiffs place reliance upon a contract of their own making, arising from an actual agreement of the parties. It is abundantly clear that the minds of the parties never met upon any proposed sale of the plaintiffs' ideas. The Corporation, as is shown above, promptly rejected plaintiffs' submission. As a matter of fact, plaintiffs concede, as they must, that there was no express offer "made by Plaintiffs to Defendant and an express acceptance thereof made by the Defendant." But, plaintiffs argue, even if there was no express contract there was "either an implied contract on the part of Defendant to compensate Plaintiffs for such devices or a quasi contractual obligation to do so rather than any express contract".

■ The difficulty with plaintiffs' implied-in-fact contract theory is that the contract implied-in-fact requires an actual agreement between the parties, just as does the express contract, the implied-in-fact contract being manifested, however, by acts and conduct rather than by express words. As Williston [6] puts it, "The elements requisite for an informal contract * * * are identical whether they are expressly stated or implied in fact". It follows, as is stated in 12 American Jurisprudence, Contracts, § 4, that "the only difference [is] in the character of evidence necessary to establish" the contract. See, also, 6 Michigan Law and Practice, Contracts § 3, and cases there cited.

■ Upon these facts, defendant's rejection of an express contract is dispositive, as well, of plaintiffs' theory of an implied-in fact contract. In Lueddecke v. Chevrolet Motor Co. (8th Cir. 1934), 70 F.2d 345, 348 (involving an alleged implied contract on the part of defendant companies to pay plaintiff the reasonable value of an idea and suggestion which he alleged he had furnished to them) it was held that "The law will not imply a promise on the part of any person against his own express declaration", for the reason, as made clear in a quotation from an earlier Massachusetts case,[7] that "As the law will not imply a promise, where there was an express promise, so the law will not imply a promise of any person against his own express declaration; because such declaration is repugnant to any implication of a promise".

6. 1 Williston, Contracts § 3 (3d ed. Jaeger 1957)

7. Earle v. Coburn (1881), 130 Mass. 596.

We note before concluding this phase of the case that the parties have devoted considerable argument to the question of whether or not submissions to the Corporation must, generally speaking, be patentable to be acceptable to it. Plaintiffs say that the explanatory pamphlet (Exhibit 3, "New Devices Activities of General Motors") is ambiguous on this subject, thus raising a jury question. Defendant, however, asserts that the language as to patents throughout the pamphlet clearly emphasizes that General Motors will not incur any *obligation* for the use of a submission, except to the extent that the submission is protected by the United States Patent Laws and that, moreover, plaintiffs so understood, citing various excerpts from the depositions taken.

Under the view this Court takes of the case the matter is irrelevant. Whether or not defendant might have accepted unpatentable devices, and the extent of its obligations thereon, if any, are of no significance on the contractual aspect of the case, in view of the prompt and unambiguous written rejection by the Corporation of plaintiffs' entire submission, patentable or not. It is clear, moreover, on the contractual aspect of the case, that the Corporation itself never tendered any offer on its own behalf to the plaintiffs, as Mrs. Van Rensselaer concedes in her deposition.[8] We hold, therefore, as a matter of law that there was neither an express contract nor a contract implied-in-fact entered into between these parties.

It is this holding that distinguishes a California case vigorously urged upon us by plaintiffs, the case of Desny v. Wilder (1956) 46 Cal.2d 715, 299 P.2d 257, involving the submission to Mr. Wilder of an idea and synopsis for a motion picture. The Desny complaint relied up-on an alleged agreement in the first count, and upon misappropriation in the second and third, as to all of which summary judgment was granted in the trial court. The Supreme Court of California affirmed as to the second and third counts, but remanded for trial on the first count with the holding that under the facts there presented the plaintiff's case was triable upon an "implied-in-fact" contract theory. But upon our facts, as we have held, supra, an implied-in-fact contract cannot be found. Rejection by the Corporation of plaintiffs' submission was prompt and unequivocal. Thus we need not get into other distinctions urged by defendant, involving the law applicable to authors and their literary creations.

■ We are thus brought to count two of the Complaint, the quasi-contract count, wherein it is charged that defendant used plaintiffs' "property" without payment of the reasonable value thereof. There is no doubt that the law is alert to provide a remedy for the unauthorized appropriation by one of the property of another. But the danger of abuse in the situation where one alleges that another has appropriated "his" property has made it equally alert to the oppressive use theory. Consequently, as was held in Mitchell Novelty Co. v. United Mfg. Co. (7th Cir. 1952), 199 F.2d 462, "The authorities set forth a number of elements which a plaintiff is required to establish as a prerequisite to a right to obtain relief in a case of the instant character. Those elements generally are (1) that the idea disclosed must be novel, (2) that it must be made in confidence and (3) that it must be adopted and made use of by the defendant. [Citations]" 199 F.2d 462, 465.

As to the requisite elements of novelty, confidential relationship, and use,

8. "My question is, have you executed any document with General Motors providing for the sale to General Motors by you of these ideas?
"A They have not tendered me an offer in response to my offer of sale for the use of my devices.

"Q So you have received no offer from General Motors Corporation for the purchase of these devices?
"A No." (at p. 157)

it was Mr. Justice Holmes who held many years ago that in a case of this kind "the starting point" is the matter of the confidential relationship between the parties. E. I. DuPont de Nemours Powder Co. v. Masland (1917), 244 U.S. 100, 102, 37 S.Ct. 575, 61 L.Ed. 1016. Accordingly, we so start, turning again to the record before us, some of which we have heretofore summarized. Plaintiffs' initial letter of inquiry (Exhibit 1) was answered by the Corporation with a covering letter (Exhibit 2) and a pamphlet (Exhibit 3). These instruments Mrs. Van Rensselaer examined and, she deposes,[9] intended to comply with in making her submissions.[10] Their warnings were clear and unambiguous with respect to any confidential relationship. The covering letter pointed out with particularity "the paragraphs in italics on pages 2 and 3", one of which said paragraphs in italics (page 2) and heavy type stated as follows:—

"No device, plan, idea or suggestion may be received 'in confidence' and no 'confidential relation' may be established with a submitter".

 Our problem is, therefore, not what facts or circumstances may give rise to a confidential relationship, but, rather, whether one person, by his gratuitous and unilateral act may impose upon another a confidential relationship, in the teeth of a declaration by that other that he is dealing at arm's length and will not enter into such a relationship. That he may not is clear. Hisel v. Chrysler Corp. (W.D.Mo.1951), 94 F.Supp. 996. Cf. Lueddecke v. Chevrolet Motor Co. (8th Cir. 1934), 70 F.2d 345; Moore v. Ford Motor Co. (S.D.N.Y.1928), 28 F.2d 529. The instruments before us being clear and unambiguous, their construc-

tion and legal effect hence becomes a question of law to be decided by the Court. National Surety Corp. of N. Y. v. Ellison (8th Cir. 1937), 88 F.2d 399. Our decision is that plaintiffs' count two as to misappropriation of property falls at its "starting point", namely, in the absence of a confidential relationship between the parties.

We have assumed, in what we have held with respect to the fiduciary relationship between the parties, that plaintiffs' submission did, in fact, comprise novel devices or ideas in which they had a property right. We would not, however, be misunderstood on this point. The assumption was made to test plaintiffs' cause of action upon the hypothesis most favorable to them. So tested it nevertheless fails. Actually, we are constrained to point out that, were the point necessary to decision, we could not avoid holding as a matter of law upon the disclosures made, that such devices as are here involved, including automobile sun visors, reclining car seats, brighter dome lights, or any combination thereof in one or more cars,[11] together with advertising material stressing comfort, leg room, head room and similar characteristics, were, none of them, novel to the General Motors Corporation. In short, these ideas and devices were not "the property" of the plaintiffs, were not theirs to sell to General Motors or anyone else, and they could not, merely by alleging ownership and novelty, acquire or enforce proprietary rights in them. Moreover, since plaintiffs had no property rights therein subject to appropriation, the extent of any arguable appropriation need not be pursued.

It is the judgment of the Court that there are no genuine, as opposed to for-

---

9. "Now, am I correct in assuming that you did intend to comply with that pamphlet and the instructions given you in the covering letter forming Exhibits 2 and 3 when you effected your submission to General Motors?
 "A Yes." (at p. 27)

10. "Thanking you for your letter of September 28 last and copy of your 'New

Devices Activities of General Motors' which we have complied with * * *" (Exhibit 4)

11. One of plaintiffs' devices, number 6, was "a design or invention * * * consisting of the 'Cadillac Sun Shade—Model Flightmobile Sedan' or Town and Country Station Wagon, (Sun-shade visors Built-in top)".

mal and colorable, issues of material fact to be tried in the matter presented.

Defendant's motion for summary judgment is therefore granted. The order may be presented.