**CROWN INDUSTRIES, INC., Plaintiff,**

v.

**KAWNEER COMPANY, Inc., Defendant.**

**No. 69 C 2010.**

United States District Court,
N. D. Illinois, E. D.

June 29, 1971.

750

Patrick W. O'Brien, Watson B. Tucker, Stephen J. Mattson, Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., for plaintiff.

Richard D. Mason, Andrew J. Bootz, Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., for defendant.

## FINDINGS OF FACT

AUSTIN, District Judge.

1. This is a civil action seeking damages for alleged misappropriation of certain proprietary rights (trade secrets) of Plaintiff by Defendant.

2. Plaintiff, Crown Industries, Inc., (hereinafter referred to as "Crown"), is a corporation incorporated under the laws of the State of Wisconsin with its principal place of business in the State of Wisconsin. Plaintiff is the owner of any and all proprietary rights claimed to have been misappropriated by Defendant. Mr. Raymond H. Boehm is President and Chief Executive Officer of Crown.

3. Defendant, Kawneer Company, Inc. (hereinafter referred to as "Kawneer"), is a corporation incorporated under the laws of the State of Delaware and has its principal place of business at Niles, Michigan.

4. On the date of filing the Complaint, the Court had jurisdiction of the parties and the subject matter.

5. Under the Complaint filed in this action, Plaintiff sought to recover damages for alleged misappropriation and unauthorized use by Defendant of proprietary information (trade secrets) which allegedly was disclosed by Plaintiff to Defendant under a relationship of trust and confidence in October of 1963 and again in October of 1965.

6. Plaintiff at the trial claimed that it was entitled to relief in this case by virtue of a breach by Defendant of a confidential relationship which allegedly existed between the parties; an implied-in-fact contract allegedly entered into by the parties; or the alleged existence of a quasi-contractual relationship between Plaintiff and Defendant. However, Plaintiff does not claim any relief for any ac-

tions or business activities of Defendant occurring after October 20, 1970, the date on which the Boehm et al. patent No. 3,534,500 was issued to Plaintiff, since it is conceded that the Boehm et al. patent discloses each and all of the features allegedly misappropriated by Defendant.

7. The involved subject matter relates to hydraulically powered automatic door operators having an actuator to automatically open and close doors in public buildings. The actuator normally is located in the hollow overhead transom bar which constitutes the overhead element of the door entrance. Conventionally, the door operator is controlled by a treadle actuated switch which responds to the weight imposed on the treadle by one or more persons approaching the door and which transmits a signal instructing the door operator to open the door and hold it open until the individual or individuals have passed through the door entrance, and to then close the door. Automatic door operators are conventionally powered by electric motors or by hydraulic power units, the latter being generally known in the trade as hydraulic "power packs".

8. The hydraulic power pack can be a remotely located unit which is located at some distance from the door actuator and which is connected to the actuator by one or two hydraulic fluid lines. Alternatively, it can be an "in-header" unit which is small enough to fit into a hollow space in the hollow overhead transom bar or header of the door entrance for direct connection with the actuator, thereby eliminating the need for the longer hydraulic fluid lines associated with the use of remote power packs. The Plaintiff makes no claim that the use of an "in-header" power pack mounted in the transom bar was originated by or unique with Plaintiff.

9. Certain of the "in-header" type power pack units may contain only a hydraulic pump which is directly connected to the door actuator and is energized in response to a signal from the treadle actuated sensor to supply the actuator with pressurized hydraulic fluid.

Other of the "in-header" type power pack units have a hydraulic pump with an accumulator which is connected to both the pump and the door actuator and which maintains a certain amount of hydraulic fluid at a specified pressure to assist the pump in supplying the required fluid to the actuator. Plaintiff makes no claim that providing an accumulator in a hydraulic power pack for a door operator could be considered as a proprietary feature of Plaintiff.

10. The subject matter here in controversy relates solely to one or more features of hydraulic power packs of the "in-header" type having an accumulator, and not to the remote type of hydraulic power pack or the "in-header" type having only a hydraulic pump. Power packs of the "in-header" type having an accumulator are exemplified by Plaintiff's drawing (DX–2), by Plaintiff's units (PX–107 and PX–121) and by Defendant's unit (PX–125).

11. Both Plaintiff's power pack and Defendant's power pack have an accumulator section which is divided into two separated chambers, i. e., a pressurized hydraulic fluid chamber and a pressurized gas chamber. Each of these devices have the accumulator equipped with a movable element (a diaphragm or a piston) which separates the chambers and moves back and forth in response to the differential between the pressure exerted on one side thereof by the hydraulic fluid and the pressure exerted on the other side thereof by the compressed gas. In each of the units, an electric pump motor control switch is provided in functional association with one or the other of the chambers in the accumulator and is operated in accordance with movement of the movable diaphragm or piston to start and stop a motor which in turn drives the pump that supplies hydraulic fluid to the hydraulic fluid chamber and the door actuator.

12. Plaintiff asserts that the power packs (PX–121 and PX–125) are identical because of the fact that both units are functionally the same, the pump motor control switch is inside the gas chamber

of the accumulator, and the positional relationship of the components is similar.

13. Prior to 1963 and to any contact between Plaintiff and Defendant, a door operator which embodied a push-pull actuator (PX–102) and which is shown in Linder et al. patent No. 3,210,065 (DX–16) was developed by Plaintiff, and the patent covering the door operator was assigned to the Plaintiff. Approximately ten of these door operators were built for the Plaintiff during the period from 1960 to 1963 or 1964, and some of these operators were installed at various locations in the Racine, Wisconsin area. These operators did not have the "in-header" accumulator type power pack, such as PX–121, which is in controversy, but instead, employed a remote type hydraulic power unit with a push-pull type actuator.

14. In 1962, Plaintiff freely disclosed and quoted a price on its DX–16 form of door operator to Alumiline Corporation, a manufacturer of store fronts, and Plaintiff freely disclosed the details of its DX–16 type of door operator to Dor-O-Matic, a manufacturer of automatic door operating equipment, and Ronan and Kunzl. In the latter part of 1962 Plaintiff freely disclosed everything it had at that time in the way of door operator devices to Jackson Exit Device Corporation, a manufacturer of door checks.

15. In the latter part of 1962 or the early part of 1963, Plaintiff began to develop and design an "in-header" type power pack to operate in conjunction with its push-pull actuator. This design included an accumulator which worked in conjunction with a hydraulic pump to supply pressurized fluid to the door actuator upon demand.

16. By the spring of 1963, Plaintiff, primarily through the work of its employees Messrs. Raymond H. Boehm, George L. Boehm, and Joseph Linder, had constructed a prototype accumulator (PX–106) to test the alleged unique concept of placing a motor control switch within the gas chamber of the accumulator. Thereafter, Plaintiff designed and constructed a prototype power pack PX–107. The power pack PX–107 was of the "in-header" type having a pump motor, a pump, a low pressure oil reservoir, and an accumulator with a rubber diaphragm separating the high pressure hydraulic fluid chamber from the high pressure gas chamber. The gas chamber of the power pack PX–107 contained a motor control switch which sensed the position of the diaphragm and controlled the operation of the pump motor.

17. In July 1963, more than two months prior to any contact between Plaintiff and Defendant, Plaintiff not only freely disclosed its DX–16 type of door operator but also the details of its prototype power pack PX–107 on a completely nonconfidential basis to a representative of The Stanley Works of New Britain, Connecticut. The Stanley Works representative was Mr. George W. French, who testified that during a July, 1963 meeting with Mr. R. H. Boehm, he, in company with a Mr. Ray Kain, specifically inquired of Mr. Boehm, before anything was disclosed to him by Mr. Boehm, as to whether or not Mr. Boehm's developments were protected by patent applications. Mr. French testified that all of the information divulged to him by Mr. Boehm during their July, 1963 meeting was disclosed on a nonconfidential basis, and at no time during this meeting did Mr. Boehm indicate that he considered any of the information he disclosed to Mr. French to be proprietary in nature or a trade secret. Mr. French, in his letter of August 28, 1963 (DX–48) to Mr. Boehm, confirmed his understanding of the basis on which the July 1963 meeting was held, as follows:

"We assume that you have protected your invention by your application for a patent and that you are depending on this application to give you the protection you require in marketing this new product. We would not expect to enter into any confidential relationship because of our examination of this product nor would we expect to have such a confidential relationship implied because we were examining the product here in New Britain."

18. After the July 1963 meeting with representatives of The Stanley Works and a certain amount of further testing of the power pack unit PX–107, Plaintiff produced at least fifteen power packs of the PX–121 type.

19. In October 1964, or thereabout, Plaintiff installed a PX–121 power pack in the M–B Supermarket in Waukegan, Illinois. The power pack installed by Plaintiff at the M–B Supermarket in Waukegan, Illinois was sold by Plaintiff to a construction company, i. e., the Huber Glass Company of Waukegan, Illinois, and the power pack was paid for by the customer. The power pack installed at the M–B Supermarket was readily accessible for inspection by third parties as is evident from Plaintiff's Photographs. Neither representatives of the Huber Glass Company nor representatives of the M–B Supermarket were ever requested by Plaintiff to observe any secrecy obligations in respect to the power pack, or requested by Plaintiff to make any tests on the power pack, or requested by Plaintiff not to show the power pack to third persons.

20. In July of 1965, or thereabout, Plaintiff installed two PX–121 power packs at the Tip Top Foods store in Union Grove, Wisconsin. The power packs at the Tip Top Foods installation were sold by Plaintiff to the Huber Glass Company of Kenosha, Wisconsin, and the power packs were paid for by the customer. The power packs at the Tip Top Foods installation were readily accessible for inspection by third parties, as is evident from Plaintiff's Photographs. Neither representatives of the Huber Glass Company nor representatives of Tip Top Foods organization were ever requested by Plaintiff to observe any secrecy obligations in respect to these power packs, or requested by Plaintiff not to show the power packs to third persons, or requested by Plaintiff, to make any tests on the power packs.

21. By October 1966, Plaintiff had installed two of its PX–121 power packs at the St. Mary's Hospital in Racine, Wisconsin. These power packs were sold by Plaintiff to Johnson-Hendrickson, a construction firm in Racine, Wisconsin, and the power packs were paid for by the customer. The power packs at the St. Mary's Hospital installation were readily accessible for inspection by third parties, as is evident from Plaintiff's Photographs. Neither representatives of the Johnson-Hendrickson company nor representatives of the St. Mary's Hospital were ever requested by Plaintiff to observe any secrecy obligations in respect to these power packs, or requested by Plaintiff not to show the power packs to third persons, or requested by Plaintiff to make any tests on the power packs.

22. In March 1967, or thereabout, Plaintiff installed two of its PX–121 power packs in the Matranga Supermarket in Kenosha, Wisconsin. These power packs were sold by Plaintiff to the Murray Glass Company of Kenosha, Wisconsin, and the power packs were paid for by the customer. The power packs at the Matranga Supermarket were readily accessible for inspection by third parties, as is evident from Plaintiff's Photographs. Neither representatives of the Murray Glass Company nor representatives of the Matranga Supermarket were ever requested by Plaintiff to observe any secrecy obligations in respect to these power packs, or requested by Plaintiff not to show the power packs to third persons, or requested by Plaintiff to make any tests on the power packs.

23. In October 1968, or thereabout, Plaintiff installed a pair of its PX–121 power packs in the Kortendick Hardware store in Racine, Wisconsin. These power packs were sold by Plaintiff to the Huber Glass Company of Kenosha, Wisconsin, and the power packs were paid for by the customer. The power packs at the Kortendick Hardware installation were readily accessible for inspection by third parties, as is evident from Plaintiff's Photographs. Neither representatives of the Huber Glass Company nor representatives of the Kortendick Hardware store were ever requested by Plaintiff to observe any secrecy obligations in respect

to these power packs, or requested by Plaintiff not to show the power packs to third persons, or requested by Plaintiff to make any tests on the power packs.

24. During the period between July 1963 and the latter part of 1969, Plaintiff had a continuing relationship, in regard to Plaintiff's door operator developments, with The Stanley Works of New Britain, Connecticut. In June of 1965, a power pack of the type exemplified by PX–121 was sent to George W. French of The Stanley Works in New Britain, Connecticut, and The Stanley Works employees completely disassembled the power pack and tested the unit. In November of 1967, Plaintiff again sent The Stanley Works a power pack exemplified by PX–121, and this unit was also tested by The Stanley Works people. Finally, in November 1968 Plaintiff delivered to The Stanley Works a draft patent application which completely disclosed the PX–121 type power pack and on November 6, 1968 completely released The Stanley Works from any confidential relationship because of this disclosure.

25. In late 1968 negotiations were commenced between Plaintiff and The Stanley Works having as their objective The Stanley Works' buying of Plaintiff's door operator developments. These negotiations continued through the latter part of 1969 when they were terminated. Mr. Edward Noyes, a vice president of The Stanley Works who was a party to the negotiations between Plaintiff and The Stanley Works, testified that Kawneer's entry into the market with its commercial power pack unit PX–125 in late 1968 was not a factor which influenced his company's decision to terminate its negotiations with Plaintiff.

26. In September 1963, Mr. R. C. Huber, who was then president of Huber Glass Company in Racine, Wisconsin and of Illinois Huber Glass Company in Waukegan, Illinois, both of which were at that time dealers for Kawneer architectural aluminum products, at the request of Mr. R. H. Boehm informed Mr. Stanley A. Lax, then a product manager of Kawneer, of the existence of the door operator which was being produced by the R. H. Boehm Company. Mr. Lax responded to Mr. Huber's advice by sending Mr. Huber a letter dated September 20, 1963 which indicated that Kawneer would be willing to evaluate the automatic door operator developed by the R. H. Boehm Company and which requested Mr. Huber to transmit a copy of the Kawneer Policy Booklet (DX–21) to Plaintiff. Mr. Huber transmitted the Lax letter and the Kawneer Policy Booklet to Mr. R. H. Boehm (DX–22). Mr. Boehm who, for the most part, was responsible for the door operator development of Plaintiff, stated that he read and understood the content of the Kawneer Policy Booklet upon receipt thereof from Mr. Huber. The Kawneer Policy Booklet states in parts as follows:

"E. No consideration will be given to any idea submitted in the expectation of compensation unless it is submitted subject to the CONDITIONS OF SUBMISSION which are set forth and explained below * * *.

"1. No confidential relationship is to be established by such submission or implied from consideration of the submitted material, and the material is not to be considered to be submitted 'in confidence.' (Confidential relationships have been held to create obligations which are beyond those that the Company is willing to assume.)

"2. The Company makes no commitment that the idea or material submitted shall be kept a secret. (It is often necessary to refer the submission to a number of different persons in Kawneer Company and its affiliated companies to ascertain whether or not it is of interest. The organization is a large one and continually changing. Thus, while there may be no intention of giving it any publicity, its secrecy cannot be promised.)

"3. The Company does not agree to pay any compensation whatsoever for its use of business, technical, or other ideas which have not been patented."

27. On October 15, 1963, Mr. R. H. Boehm wrote a letter (DX–22) to Mr.

Lax inviting Mr. Lax to visit the R. H. Boehm Company plant in Racine, Wisconsin, for the purpose of showing Mr. Lax the door operator developments of Plaintiff. In this letter, Mr. Boehm indicated that Plaintiff had patent applications filed covering the apparatus which was to be shown to Mr. Lax at an ensuing meeting to be held in Racine, Wisconsin, on October 30, 1963. Upon receipt of the Boehm letter of October 15, 1963, and after conferring with Mr. Dan Muessel, Mr. Lax called Mr. Boehm to verify his (Lax's) understanding that the R. H. Boehm Company did, in fact, have one or more patent applications filed covering the units described in the third paragraph of DX–22. In the telephone conversation between Messrs. Lax and Boehm, Mr. Boehm indicated, to Mr. Lax's satisfaction at least, that Plaintiff had patent applications filed covering the apparatus which were to be shown to Mr. Lax, and Mr. Lax placed a long-hand notation "Patent Application *Filed*" on DX–22 opposite the last sentence of the third paragraph of DX–22. On October 30, 1963, the first, and only, face-to-face contact between representatives of Kawneer and a representative of the R. H. Boehm Company occurred when Mr. Lax and Mr. Richard G. Klein, the latter being employed by Defendant in an engineering capacity, visited Mr. R. H. Boehm at his place of business in Racine, Wisconsin.

28. During this October 30, 1963 meeting, Messrs. Lax and Klein were shown the door operator of the type shown and described in DX–16 and a prototype of Plaintiff's power pack in controversy, PX–107, and Mr. Boehm explained the function of this device and a prototype accumulator PX–106 to Messrs. Lax and Klein. During this meeting, a commercial installation of the door operator without a power pack of the PX–121 type was also shown to Messrs. Lax and Klein.

29. At no time during the October 30, 1963 meeting was the content of the Kawneer Policy Booklet (DX–21) discussed. At no time during the October 30, 1963 meeting did Mr. Boehm advise Messrs. Lax and Klein that he believed that the units PX–106 and PX–107 contained trade secrets or proprietary technical features. At no time during the October 30, 1963 meeting, or otherwise, did Mr. Boehm advise Messrs. Lax and Klein that he was disclosing any of his devices or any information to them on a confidential basis or under a relationship of trust and confidence. At no time during the October 30, 1963 meeting, or otherwise, was Defendant advised by Plaintiff that Plaintiff expected to be compensated in any manner for use by Defendant of anything which Plaintiff was about to or did show to Defendant. Shortly after the October 30, 1963 meeting, Mr. Klein wrote a memorandum which recorded certain of the operating characteristics of the overall door operator which had been shown to him by Mr. Boehm and which indicated the door operator was covered by a filed patent application. The record is clear that no meeting of the minds on the matter of Defendant compensating Plaintiff in any way for information obtained by Defendant from Plaintiff ever occurred, and all of the evidence of record negates the possibility of inferring such a meeting of the minds.

30. Subsequent to the October 30, 1963 meeting, certain correspondence occurred between the parties, and in October 1965 R. H. Boehm Company shipped a door operator to Defendant in Niles, Michigan, but no part drawings were received by Kawneer. The unit sent in October 1965 to Kawneer was bench tested under the direction of Mr. Klein, and a memorandum (DX–124) was submitted to Mr. Lax by Mr. Klein indicating the undesirable features of the Boehm unit. The opinions expressed in Mr. Klein's memorandum (DX–124) to Mr. Lax were copied by Mr. Lax in his January 13, 1966 letter (DX–11) that was sent to Mr. Boehm. The return of the Boehm door operator unit to the R. H. Boehm Company and transmittal of the letter (DX–11) to Mr. Boehm, marked the end of the relationship between Plaintiff and the R. H. Boehm Company

on the one hand and the Defendant on the other hand until the present controversy arose.

31. The development of Defendant's power pack was stimulated by the employment of Mr. C. S. Hansen by Kawneer as Vice President in charge of marketing late in 1962. Prior to his employment by Kawneer in this position, Mr. Hansen had been vice president in charge of sales at Dor-O-Matic where he became completely familiar with the hydraulic door operators and components thereof which were being manufactured and sold by Dor-O-Matic in 1962 and earlier. As Vice President in charge of marketing at Kawneer, Mr. Hansen was responsible for new product development. As product manager of entrances, Mr. Lax reported directly to Mr. Hansen. Mr. Richard G. Klein reported to the chief engineer in charge of product development who, in turn, reported to Mr. Hansen.

32. Immediately upon his employment by Kawneer in late 1962, Mr. Hansen made the decision to develop an "in-header" type hydraulic door operator and power pack and placed a stiff cost target on the operator as to its eventual cost in production. Some time early in 1963, Mr. Richard G. Klein was designated as supervisor of mechanical products engineering and was assigned the development of the Kawneer hydraulic door operator which was then known as the C-1 project.

33. It was always the intention of Kawneer that the actuator portion of the hydraulic door operator would be developed primarily by Kawneer, but that preferably the power pack would be obtained from an outside source. To implement this intention, Mr. Klein in 1963 sent letters to the major pump manufacturers which letters outlined the specifications for the power pack pump, in particular, its capacity, size and shape. Throughout most of 1963, Kawneer continued its development of the actuator portion of the door operator and, although a certain amount of design work was done on a power pack, it was primarily felt by Mr. Klein as well as others within the Kawneer organization that a satisfactory power pack could be obtained from an outside source at a satisfactory price. By the end of 1963, Kawneer had not obtained a satisfactory power pack pump from an outside source and Kawneer, under the direction of Mr. Klein, did a certain amount of development work on a power pack. During this period, the direct pump power pack was the type upon which most of the design work was done, since the direct pump type power pack would be the simplest type of power pack to develop and could be produced at the least possible cost.

34. Some time in 1963, Mr. Larry O. Steele was assigned to work on the C-1 hydraulic door operator with Mr. Klein and, among other things, he worked on the power pack to be used in the C-1 door operator.

35. Mr. Steele, although primarily working on the direct-pump unit and the actuator, did do some work on a power pack embodying an accumulator, and in the latter part of 1964 tested the concept of using the accumulator with the direct-pump unit although he was aware of the uses of accumulators before being employed by Kawneer. By the end of 1964, Mr. Steele had made certain drawings disclosing a power pack embodying an accumulator having hydraulic fluid and gas chambers separated by a diaphragm assembly and having a motor control switch positioned inside the gas chamber of the accumulator. However, because the test of the prototype power pack with the accumulator was not satisfactory and because of the urgency of finalizing the design of a direct-pump unit to be used in field tests of the C-1 door operator, the accumulator type power pack was abandoned and development work of the C-1 operator with the direct-pump type power pack continued throughout the early part of 1965. During the latter half of 1965 and the early part of 1966, the C-1 operator with the direct-pump type power pack was field tested in various locations. The drawings contained in DX-108 generally reflect the

engineering work, including dimensions, material specifications, and other detailed engineering information, which was done between March of 1963 and March of 1966 on the hydraulic power pack for the C–1 operator that was field tested in 1965 and 1966.

36. In April 1966, Mr. Klein terminated his employment with Kawneer, and Mr. Steele continued the development work on the Kawneer door operator. Mr. Klein testified that no engineering information of the form typified by the drawings in DX–108 was ever received by Kawneer from Plaintiff. Mr. Klein further testified that during the years 1963 through April 1966 when he worked on the C–1 operator no benefits whatsoever were obtained by Kawneer as a result of his inspection and testing of the Boehm door operator development in October of 1963 and in the latter part of 1965.

37. After April of 1966, the field tests of the C–1 operator continued through the latter part of 1966. In certain tests conducted in Milwaukee, Wisconsin, power packs of the direct-pump type unit tended to overheat due to heavy traffic through the door entrances during the Christmas holidays of 1966. Because of this overheating of the direct-pump units, development work on the accumulator type power pack was resumed by Kawneer, and in January 1967 Mr. Steele gave a preliminary assembly drawing (PX–180) for such a power pack to Mr. Richard G. Swanson, who was working on the C–1 project with Mr. Steele. During the period subsequent to January 1967, the assembly drawing (PX–180) was completed, and many of the detail drawings for the accumulator-type power pack, which drawings are contained within DX–145, were drawn by Mr. Swanson. In September 1967 the first of several prototypes of the accumulator-type power packs were built by Kawneer.

38. In the fall of 1967, Mr. Steele terminated his employment with Kawneer and Mr. Swanson continued the development of the power pack with an accumulator. Mr. Steele testified that he had little or no recollection of the Boehm door operator that was sent to Kawneer in 1965, and that he recalled that Mr. Klein and Mr. Lax took a trip to Racine, Wisconsin in October of 1963, but recalled no conversation about or details concerning the trip. Mr. Steele further testified that any knowledge that might have been imparted to him about the Boehm operator in no way influenced his work on the Kawneer C–1 power pack having an accumulator.

39. In the latter part of 1967 and early part of 1968, a total of six prototype accumulator type power packs were built and lab tested by Mr. Swanson. Thereafter, the accumulator type power packs were field tested and the C–1 operator having an accumulator type power pack exemplified by PX–125 was released to the market some time in September 1968.

40. Mr. Swanson testified that he had no knowledge whatsoever of the Boehm door operator developments until the present controversy arose and, therefore, the Boehm door operator development had no effect whatsoever on his development work on the C–1 door operator power pack PX–125.

41. In order to place the Kawneer power pack (PX–125) in production, it was essential to first prepare and have available detailed parts and assembly drawings on the device like those contained within group exhibit DX–145. Mr. Klein testified that no such drawings were ever received by Kawneer from Plaintiff.

42. The record shows that it required approximately six years, i. e., from late 1962 until September 1968 for Kawneer to conceive, design, develop and field test a hydraulic power pack as exemplified by PX–125, which it considered to be a marketable product. All of this work was conducted by Kawneer independently of anything Kawneer learned or might have learned from its contacts with R. H. Boehm Company or Plaintiff, and the Kawneer work was not accelerated or otherwise influenced in any way by anything which Kawneer learned about Plaintiff's hydraulic power pack.

43. Both the Plaintiff's power pack PX–121 and the Kawneer power pack PX–125 have basically the same components. This is to be expected since both power packs perform essentially the same function of opening a door and are designed to fit within the hollow overhead transom bar of a door entrance. However, and as indicated on DX–103, the statements on which Mr. Klein testified he believed to be true, there are substantial differences between the power packs PX–121 and PX–125. In Defendant's power pack PX–125, the hydraulic fluid pump drive motor is submerged inside the low pressure hydraulic fluid reservoir, whereas in Plaintiff's power pack PX–121, the drive motor and the hydraulic fluid reservoir are physically separated and are mounted in end-to-end relationship. The submerging of the motor in the low pressure oil reservoir of the Kawneer power pack PX–125 affords a number of advantages such as most efficient utilization of space, the uprating of the motor operating capacity, and a more efficient dissipation of heat. Although both power packs PX–121 and PX–125 have an accumulator cylinder divided into two chambers by a movable boundary, the Kawneer power pack PX–125 utilizes a piston type boundary whereas the Plaintiff's power pack PX–121 has a resilient diaphragm type boundary. In Defendant's power pack PX–125, the oil pressure chamber portion of the accumulator is positioned next to the low pressure oil reservoir of the device, whereas in Plaintiff's power pack PX–121 the oil pressure chamber is separated from the oil reservoir by the air chamber of the accumulator. The overall size and shape of Plaintiff's power pack PX–121 is different from Defendant's power pack PX–125. Defendant does not use Plaintiff's allegedly unique "bubble-tight" check valve in its hydraulic circuit. Defendant does not use Plaintiff's allegedly unique solenoid valve in its hydraulic system. Defendant's power pack PX–125 requires a high pressure oil line and a separate return oil line whereas Plaintiff's structure as shown to Messrs. Klein and Lax in 1963 and sent to Kawneer in 1965 only required a single oil delivery and return pipe. As both Mr. Boehm and Mr. Klein testified, there are no close tolerance interfitting parts of Plaintiff's power pack PX–121 which can be used in Defendant's power pack PX–125, or vice versa.

44. Although both of the power packs PX–121 and PX–125 have the motor control switch located inside the gas chamber of the accumulator to sense the position of the boundary separating the gas chamber from the high pressure hydraulic fluid chamber of the accumulator, the Kawneer power pack PX–125 connects the switch in the gas chamber to a solid-state relay device so that only a low voltage, low current circuit is present in the gas chamber, whereas in Plaintiff's power pack PX–121 the switch within the gas chamber directly controls energization and de-energization of the pump motor. Defendant's power pack PX–125 utilizes a pump having a gerotor type gear arrangement, whereas Plaintiff's power pack PX–121 incorporates a conventional external two-gear pump. The gerotor type pump tends to be much quieter in operation. The Kawneer power pack PX–125 incorporates an over-pressure relief valve for relieving the pressurized gas in the gas chamber of the accumulator in the event excessive heat is generated in the power pack PX–125 and the gas expands beyond some preset safety valve whereas no gas relief valve is present in the Plaintiff's power pack PX–121.

45. The Kawneer power pack PX–125 is not a copy of the Plaintiff's power pack PX–121.

46. Plaintiff's power pack PX–121 as shown in DX–101 contains a pump motor 1, a pump 3, an accumulator 8, and a solenoid valve assembly 18 through which the power pack can be connected to a door actuator. Each of the major components of the Plaintiff's power pack PX–121 is in substantially end-to-end relationship along a central axis and is small enough to fit within the overhead transom bar of a door entrance. The ac-

cumulator portion 8 of Plaintiff's power pack PX–121 has a high pressure fluid chamber 6 which is separated from a high pressure gas chamber 5 by a movable boundary 7 (a flexible diaphragm). A switch 19 is located within the gas chamber 5 which senses the position of the movable boundary 7 and controls the energization of the pump motor 1.

47. Plaintiff asserts that the alleged unique feature of placing the switch 19 in the gas chamber 5 of the accumulator 8 in its power pack PX–121 to sense the position of the movable boundary 7 and control the operation of the pump motor 1 enabled it to construct an integral power pack in which the components are substantially in end-to-end relationship along a central axis so that it was small enough to fit within the overhead transom bar of a door entrance.

48. As shown in DX–104, the power pack disclosed in United States patent No. 2,197,772 issued to E. A. Rockwell on April 23, 1940 (DX–127) is an integral unit utilizing a pump motor 20, a pump, and an accumulator having a high pressure fluid chamber 61 separated from a pair of coiled spring biasing means 17 by a movable boundary 65 (a piston). The pump motor of the power pack shown in Figs. 1 and 2 of the Rockwell patent and in DX–104 and DX–107 is controlled by means of a switch 93, 94 which directly senses the position of the movable boundary 65. Although the power pack disclosed in the Rockwell patent does not utilize a high pressure gas chamber in the accumulator portion of the power pack, the pair of coiled springs 17 supplies a biasing force on the movable boundary 65 to assist to maintain the pressure of the hydraulic fluid in the hydraulic fluid chamber 61 of the Rockwell device. The major components of the power pack disclosed in the Rockwell patent are in substantially end-to-end relationship along a central axis of the power pack. One of the objectives of the Rockwell design "is to provide such an accumulator apparatus so constructed as to occupy a minimum amount of space." A power pack of the type shown in the Rockwell patent could be used to supply high pressure hydraulic fluid to a hydraulic door actuator.

49. The power pack disclosed in the Rockwell patent is functionally identical to the Plaintiff's power pack PX–121.

50. As shown in DX–104, DX–105 and DX–107, the power pack disclosed in United States patent No. 2,752,754 issued to L. F. Jaseph on July 3, 1956 (DX–109) embodies an accumulator having a pump motor 68, a pump 60, and a high pressure hydraulic fluid chamber (colored green) which is separated from a spring biasing means 50 by a movable boundary 24 (a piston). A switch 40 is located outside the high pressure hydraulic fluid chamber of the accumulator in the Jaseph structure and directly senses the position of the movable boundary 24 as it moves in accordance with the volume of the hydraulic fluid in the high pressure hydraulic fluid chamber of the accumulator. The switch 40 controls the pump motor 68 to cause high pressure hydraulic fluid to be pumped into the hydraulic fluid chamber whenever the supply of hydraulic fluid in the hydraulic fluid chamber is depleted a certain amount.

51. The power pack disclosed in the Jaseph patent is functionally identical to the Plaintiff's power pack PX–121.

52. A power pack of the type shown in the Jaseph patent (DX–109) can be utilized to supply high pressure hydraulic fluid to a hydraulic door actuator.

53. The use of an accumulator as a part of a hydraulic power pack for a hydraulic door operator is completely disclosed in United States patent No. 3,084,-927 issued to J. M. Linder on April 9, 1963 (DX–129), and the Dor-O-Matic power pack illustrated on the Defendant's charts DX–104 and DX–106 and schematically shown on Defendant's Exhibit DX–126–C. The accumulator disclosed in the Linder patent (DX–129 and DX–105) utilizes a high pressure gas chamber separated from the high pressure hydraulic fluid chamber 109 by a flexible diaphragm 110. The pump motor 102 in the power pack disclosed in the Linder patent (DX–129) is controlled

by a float switch 101 which indirectly senses the position of the flexible boundary 110 within the accumulator chamber of the power pack and hence the volume of hydraulic fluid in the chamber 109.

54. The pump motor of the Dor-O-Matic power pack as schematically shown on DX–126–C is controlled by a pressure sensitive switch which indirectly senses the position of the movable boundary within the accumulator portion of the Dor-O-Matic power pack.

55. As shown in DX–104, a pressure reservoir or accumulator 31 is disclosed in United States patent No. 2,597,050 issued to P. G. J. M. Audemar on May 20, 1952 (DX–128). In figures 4–6 of the Audemar patent (DX–128) and in the specification of the Audemar patent, the interchangeability of a gas chamber for a spring biasing means on a movable boundary in an accumulator is completely disclosed.

56. The use of an accumulator type power pack for a hydraulic door operator was well known prior to the development of Plaintiff's power pack PX–121.

57. It was well known in the prior art to have a hydraulic power pack with a pump motor, a pump, and an accumulator arranged in substantially end-to-end relationship along a central axis.

58. It was well known in the prior art to have an accumulator with a hydraulic fluid chamber separated from a biasing means by a movable boundary.

59. It was well known in the prior art to have a switch inside an accumulator chamber to sense the volume of hydraulic fluid in the high pressure hydraulic fluid chamber of the accumulator and to control the energization of the pump motor.

60. Little or no engineering skill or ingenuity was required in late 1962 to utilize a gas chamber in place of the coiled springs in the power packs disclosed in the Rockwell and Jaseph patents (DX–127 and DX–109) in view of the disclosure in the Audemar patent (DX–128) that a gas chamber is equivalent to or interchangeable with spring biasing means provided in a pressure reservoir or accumulator. If the coil springs in the power pack disclosed in the Rockwell patent were replaced by a gas chamber, such as that disclosed in the Audemar patent, the switch sensing the position of the movable boundary and controlling the pump motor would be located within the gas chamber of the accumulator of the power pack disclosed in the Rockwell patent.

61. The power packs disclosed in the Rockwell and Jaseph patents disclose substantially all of the unique features which the Plaintiff asserted are embodied in its power pack (DX–121).

62. Plaintiff's power pack PX–121 is completely disclosed by the prior art, and any differences between the prior art and the Plaintiff's power pack PX–121 would take but little, if any, engineering skill or ingenuity to conceive in 1962.

63. Plaintiff's power pack DX–121 does not have any unique features in view of the prior art as it existed in 1962 and the power pack PX–121 is lacking in novelty.

64. Any finding of fact entered herein which may be properly construed in whole or part as a conclusion of law shall be so construed and treated as if set forth under the following conclusions of law.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter of this action under 28 U.S.C. Section 1332(a) (1) and venue is proper under 28 U.S.C. Section 1391(a) and (c).

2. The law of the forum, Illinois, is determinative of the substantive issues raised. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

3. A federal District Court must apply the conflict of law rules of the state in which it sits. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

4. The applicable Illinois rule is that in an action based upon alleged mis-

appropriation of proprietary information or trade secrets, the law of the place where the alleged wrong was committed or the benefit was obtained by the defendant should govern. Smith v. Dravo Corp., 203 F.2d 369, 373 (7th Cir. 1953).

5. The law of the State of Michigan is applicable in this case for the reason that the principal place of business of Defendant Kawneer is in Niles, Michigan, at which place any alleged wrong of Defendant Kawneer would have occurred.

6. To be entitled to equitable relief, Plaintiff has the burden of showing, among other things, that the information disclosed to Defendant Kawneer was, in fact, a trade secret. Midland-Ross Corp. v. Sunbeam Equipment Corp., 316 F. Supp. 171, 177 (W.D.Pa.1970), affirmed, 435 F.2d 159 (3rd Cir. 1970). Otherwise, the granting of relief would be contrary to the mandate of the Supreme Court in Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, at page 231, 84 S.Ct. 784, at page 789, 11 L.Ed.2d 661 (1964), wherein the Court stated:

> "An unpatentable article, like an article on which the patent has expired, is in the public domain and may be made and sold by whoever chooses to do so."

7. When Plaintiff's power packs, exemplified by PX–121, which contained the alleged proprietary information were sold without any restrictions imposed on the buyer or user of the power packs and were installed in at least five public locations that made the power packs readily accessible to members of the public, there was a complete public disclosure of the subject matter of the alleged trade secret which destroyed any proprietary rights Plaintiff might have had in its power pack. Dollac Corp. v. Margon Corp., 164 F.Supp. 41, 57 (N.J.1958).

8. Even though the Plaintiff's power packs, exemplified by PX–121, might have had to be rendered inoperative and examined by an engineer in order to discover the alleged trade secrets contained therein, the sale of the power packs nev-ertheless constituted a public disclosure which defeats a claim founded upon alleged misappropriation of the trade secrets allegedly contained in the power packs. Midland-Ross Corp. v. Sunbeam Equipment Co., 316 F.Supp. 171, 177 (W.D.Pa.1970), affirmed, 435 F.2d 159 (3rd Cir. 1970).

9. The unrestricted disclosure by Plaintiff of its power pack, exemplified by PX–121, to at least one third party on a completely nonconfidential basis removed any indicia of secrecy which is necessary for proprietary information to be considered a trade secret and defeats any claim founded upon alleged misappropriation of the trade secrets allegedly contained in Plaintiff's power packs. Lueddecke v. Chevrolet Motor Co., 70 F. 2d 345, 349 (8th Cir. 1934); Aktiebolaget Bofors v. United States, 93 F.Supp. 131, 133 (D.C.1950), affirmed, 194 F.2d 145 (1951). 90 U.S.App.D.C. 92.

10. Under the applicable law, "[t]he authorities set forth a number of elements which a plaintiff is required to establish as a prerequisite to a right to obtain relief in a case of the instant character. Those elements generally are (1) that the idea disclosed must be novel, (2) that it must be made in confidence and (3) that it must be adopted and made use of by the defendant." Mitchell Novelty Co. v. United Mfg. Co., 199 F.2d 462, 465 (7th Cir. 1952). In the instant case, Plaintiff has failed to satisfy any of these elements by any competent proof, much less by a preponderance of the evidence, as the law requires.

11. The determinative question with respect to the novelty of Plaintiff's alleged trade secret is "* * * whether plaintiff's alleged secret process, in all its details, is disclosed in the patents or prior art teachings. If all essential details have been disclosed, the process has become a part of the public domain and cannot be claimed by plaintiff as its property." Ferroline Corp. v. General Aniline & Film Corp., 207 F.2d 912, 921 (7th Cir. 1953). See also Sarkes Tarzian, Inc. v. Audio Devices, Inc., 166 F. Supp. 250, 263–264 (S.D.Cal.1958), citing

as authority Russell v. Wall Wire Products Co., 346 Mich. 581, 78 N.W.2d 149 (1956), and affirmed per curiam, 283 F.2d 695 (9th Cir. 1960).

12. Since the Plaintiff's power pack, exemplified by PX–121, is completely disclosed in the prior art (Findings of Fact, Nos. 63 and 64), Plaintiff is not entitled to any relief for the alleged misappropriation of information imparted to Defendant relating to its power pack.

■ 13. In regard to the prerequisite of a confidential relationship, no recovery may be granted for misappropriation of proprietary information on the basis of a quasi-contractual (unjust enrichment) or breach of a confidential relationship cause of action unless a confidential relationship existed between the parties at the time of Plaintiff's disclosure of the information to Defendant. Mitchell Novelty Co. v. United Mfg. Co., 199 F.2d 462, 464–465 (7th Cir. 1952); Van Rensselaer v. General Motors Corp., 223 F.Supp. 323, 330 (E.D.Mich.1962), affirmed per curiam, 324 F.2d 354 (6th Cir. 1963).

■ 14. In order that a confidential relationship may be found to exist between the parties, the disclosor, Plaintiff, must warn the disclosee, Defendant, that the information received by the disclosee is of a secret nature which is to be held in confidence. Furr's Inc. v. United Specialty Advertising Co., 385 S.W.2d 456, 459–460 (Texas Court of Civil Appeals, 8th District, 1964).

15. No confidential relationship existed between the Plaintiff, Crown, and the Defendant, Kawneer, because Plaintiff never requested Defendant to keep the nature or details of Plaintiff's power pack in confidence; nor was the relationship between Plaintiff and Defendant of the type from which such a confidential relationship could be implied. Van Rensselaer v. General Motors Corp., 223 F. Supp. 323, 331 (E.D.Mich.1962), affirmed per curiam, 324 F.2d 354 (6th Cir. 1963); Furr's Inc. v. United Specialty Advertising Co., 385 S.W.2d 456, 459–460 (Texas Court of Civil Appeals, 8th District, 1964).

■ 16. No recovery for misappropriation of proprietary information under an implied-in-fact contract theory may be granted without proof by Plaintiff that a trade secret existed. Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 231, 84 S.Ct. 784, 789, 11 L.Ed.2d 661 (1964); Lear, Inc. v. Adkins, 395 U.S. 653, 677, 89 S.Ct. 1902, 1914–1915, 23 L.Ed.2d 610 (1969).

17. No recovery under an implied-in-fact contract theory can be granted where, as here, the Defendant Kawneer had expressly declared to Plaintiff its unwillingness to be bound by such a contract. Thus, "the law will not imply a promise on the part of any person against his own express declaration." Lueddecke v. Chevrolet Motor Co., 70 F.2d 345, 348 (8th Cir. 1934); Van Rensselaer v. General Motors Corp., 223 F.Supp. 323, 329–330 (E.D.Mich.1962), affirmed per curiam, 324 F.2d 354 (6th Cir. 1963).

18. No relief can be granted to a Plaintiff on an implied-in-fact contract theory unless it is first established that there was a meeting of the minds of the Plaintiff and the Defendant, that the Plaintiff was to be compensated in some way for use of the disclosed information, or unless circumstances are established from which a meeting of the minds may reasonably be inferred. Lueddecke v. Chevrolet Motor Co., 70 F.2d 345, 348 (8th Cir. 1934); Van Rensselaer v. General Motors Corp., 223 F.Supp. 323, 329–330 (E.D.Mich.1962), affirmed per curiam, 324 F.2d 354 (6th Cir. 1963).

19. No recovery can be granted for misappropriation of proprietary information where, as here, the Defendant's power pack, as exemplified by PX–125, was produced independently of the disclosures made by the Plaintiff to Defendant and where, as here, the information contained in the disclosures made to Defendant was not used by the Defendant in producing its power pack. Houser v. Snap-On Tools Corporation, 202 F.Supp. 181, 186 (D.C.Md.1962).

20. Plaintiff having failed to establish any cause of action against Defendant, the Complaint herein is dismissed with costs to Defendant.